NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 180676-U

NOS. 4-18-0676, 4-18-0678 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 15, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| CONTRELL D. WILLIAMS, | ) | Nos. 94CF833 |
| Defendant-Appellant. | ) | 94CF835 |
| | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held:*  As the State conceded, defendant was improperly denied the option to be
sentenced under the statutory scheme applicable on the date of the offenses or the
statutory scheme that existed at the time of resentencing; he is entitled to a new
resentencing hearing.

¶ 2    After defendant, Contrell D. Williams (born September 14, 1976), filed a

postconviction petition challenging the constitutionality of his life sentences, the trial court

resentenced defendant to life imprisonment for offenses he committed when he was under 18

years old. On appeal of his new life sentences, defendant argues he is entitled to resentencing

because (1) the trial court failed to find him permanently incorrigible and to properly weigh

sentencing factors before imposing life sentences and this court should thus mandate he be

sentenced to no more than 40 years' imprisonment at resentencing; (2) the court failed to

admonish him of his right to choose to be resentenced under the first degree murder sentencing

statute in effect on the date of the offense or as it existed at resentencing; (3) his sentences violate the holding of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), as the sentences were based on a fact finding not found proven beyond a reasonable doubt; and (4) he was denied the effective assistance of counsel. The State concedes error on the second issue and argues we need not consider the remaining issues. We agree to the concession and decline to address the remaining issues. We vacate defendant's sentences and remand for further proceedings.

¶ 3                                     I. BACKGROUND

¶ 4          Defendant's life sentences followed two distinct trials involving three murders. In December 1994, defendant was convicted of the murder of Sheri Ellis. In June 1995, defendant was found guilty of the first degree murder of Cary Whitacre and Shane Storm.

¶ 5                          A. The Trial for the Murder of Ellis

¶ 6          Defendant and a codefendant, Tyrone Humphrey, were charged with the first degree murder of Ellis, a clerk at a Huck's convenience store. Defendant and Humphrey were tried separately.

¶ 7          At defendant's trial, the State presented testimony Ellis's body was found in a pool of blood behind the store counter. The cash register was open and empty. The surveillance tape was missing. Among the State's evidence was testimony from Antonio Gray, who was incarcerated in the Macon County jail when defendant was incarcerated there. Gray and defendant conversed about Ellis's murder. Defendant told Gray he and Humphrey, defendant's cousin, robbed the Huck's store. Defendant, who was masked, took $30 from Ellis and then shot her. Defendant went to the storeroom and took the security videocassette recorder (VCR). As he was leaving the store, defendant shot Ellis twice more. After Gray asked defendant why he shot Ellis when he was masked and she would not be able to identify him, defendant said he could not

- 2 -

stop as it felt so good to him.

¶ 8    A neurosurgeon who treated Ellis testified she had two penetrating wounds in her head and two additional wounds in her neck. She was alive when she was taken to the hospital. However, Ellis had suffered a massive brain injury and was comatose. Ellis died of a gunshot wound to her brain.

¶ 9    After the jury found defendant guilty of Ellis's murder, the trial court sentenced defendant to life imprisonment. The court agreed with the State's argument Ellis's murder "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

¶ 10    B. The Trial for the Murders of Whitacre and Storm

¶ 11    On September 8, 1994, defendant and Humphrey were charged with the August 10, 1994, murders of Whitacre and Storm. According to the charges, both were shot in the head.

¶ 12    At defendant's trial, the State elicited the testimony of two witnesses who stated defendant admitted the murders. Gray testified defendant, while both were incarcerated together, told him about the murders. According to Gray, defendant and Humphrey were walking when they saw "two white guys" in a car. They asked for a ride. Humphrey then pulled out a gun and robbed the two men of $50. Humphrey told defendant to drive somewhere and then shot the two men. Gray testified defendant admitted being there but said he did not murder the two.

¶ 13    Larry Krause also testified defendant admitted to the murders. According to Krause, defendant said he was involved with the two men found by the lake. Defendant reported the two picked "them up" and gave "them" a ride. Defendant did not specify whom he was with. Defendant told Krause "they" rode around and then took them by the lake and killed them. Defendant provided no further detail regarding the murders but showed Krause a hat he took from one of the victims.

¶ 14    Other testimony established the bodies of Whitacre and Storm were found lying face down with their hands behind their heads. The physician who conducted the autopsies of Whitacre and Storm testified Storm had three gunshot wounds to his head, behind his right ear. Whitacre had two bullet wounds to his head.

¶ 15    For the murders of Whitacre and Storm, the trial court agreed mandatory life sentences were required under section 5-8-1(b) of the Unified Code of Corrections (Corrections Code) (730 ILCS 5/5-8-1(b) (West 1994)) and sentenced defendant to a term of natural life.

¶ 16                    C. Postconviction Petitions

¶ 17    In June 2013, defendant filed *pro se* petitions for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 to 122-7 (West 2012)), asserting his life sentences were unconstitutional under *Miller v. Alabama*, 567 U.S. 460, 479 (2012).

¶ 18    In April 2016, the State filed, in both cases, a motion to schedule resentencing. The State conceded defendant was entitled to resentencing and acknowledged defendant, a juvenile at the time of the sentence, was sentenced to an automatic natural life sentence in violation of *Miller* and *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016) (holding *Miller* applies retroactively). We note here the *automatic* natural life term was applied only in the Whitacre-Storm case. In the Ellis case, the life sentence was ordered after the trial court found it did not believe rehabilitation was possible and the offense was exceptionally brutal and heinous. Later, the State argued defendant was not entitled to a new sentencing hearing in the Ellis case, contending the analysis of the trial court at the original sentencing complied with *Miller*. After a February 2018 hearing, the trial court disagreed with the State. Although the sentencing court mentioned defendant's age during the 1994 sentencing, the court found the record did not show the sentencing court considered the attendant circumstances of defendant's age as required by

- 4 -

*Miller*. The court concluded defendant was entitled to a new sentencing hearing in the Ellis case as well.

¶ 19                                    D. Resentencing

¶ 20         The hearing on defendant's resentencing was held in September 2018. The presentence investigation report indicates defendant had been incarcerated since September 7, 1994. The report demonstrates, since his imprisonment, defendant had one conviction for armed violence. The date of "08-16-99" is listed on the report, but the report fails to indicate if this is the date of the offense or the conviction. For this offense, defendant was sentenced to 10 years' imprisonment. The report provides no other charges or pending charges.

¶ 21         The State called Patrick McElroy to testify. McElroy, who had retired from the Decatur Police Department, testified in 1994 he worked on the investigations of the murders of Storm, Whitacre, and Ellis. He also worked on the "Massoud Aliabadi case." On July 29, 1994, Aliabadi was alone in Ali's Market when three males entered the store. Defendant, identified as the larger of the males, entered the store carrying a semiautomatic pistol. The males took the cash drawer and demanded keys to Aliabadi's truck. Aliabadi mistakenly handed them keys to the business instead of to the truck. Defendant returned and shot defendant several times in his arms. Defendant's fingerprints were found on the cash drawer taken from Aliabadi's store. Humphrey was one of the other offenders.

¶ 22         McElroy testified, on August 10, 1994, he, while on duty, received the call two bodies were found by the dam. When McElroy arrived, he observed Whitacre and Storm's bodies face down on the ground with their hands behind their heads. The vehicle the victims were riding in had been burned. As part of the investigation, McElroy interviewed Humphrey. According to Humphrey, on August 10, he and defendant were at a pay phone when two men

pulled up in a car. Humphrey thought one of the two men wanted to use the phone, so they started a conversation. Humphrey and defendant asked for a ride. Defendant and Humphrey got into the car. One of the men said he had $50 and asked if Humphrey and defendant could get them drugs. After Humphrey said he could, the driver moved to the backseat with Humphrey. Defendant began driving the car. Humphrey pulled out a handgun and set it on his knee. McElroy further testified:

> "And [Humphrey] had given him the look—or [defendant] had given him the look like—which Mr. Humphrey said it was, let's rip these dudes off. So [defendant] drove down a little lane down by the dam, back down to the lane and told [Humphrey] to do it. So he got the two males out of the car, walked them down the lane, and they told them to lay down on their stomachs. I said, 'Are you the one that directed the two white males to put their hands behind their head[s]?' He said, 'If I do, I don't recall saying that.' "

Humphrey then shot Storm and Whitacre. Defendant burned the car.

¶ 23    McElroy next testified regarding the murder of Ellis, which occurred on September 5, 1994. McElroy interviewed Humphrey regarding Ellis's murder. Humphrey and defendant, who was armed with a handgun, walked into Huck's and demanded money. Humphrey yanked the surveillance camera from the bracket. He and defendant took $34 and a carton of cigarettes. As Humphrey was leaving the store, he heard four shots. The video revealed defendant shot Ellis.

¶ 24    The State also presented victim impact statements from family members of the

victims. The family members desired a life sentence for defendant.

¶ 25        Defendant presented evidence in mitigation. Deloris Williams, defendant's mother, testified defendant resided with her before his incarceration. Before the summer of 1994, defendant began living with his girlfriend. Defendant's biological father had no contact with defendant. While defendant was a child, Deloris and defendant lived with Deloris's boyfriend, Myron Turner, in Indiana. Deloris and Turner had a child, defendant's half-brother. In November 1989, Deloris and defendant moved to Decatur, where Deloris had some family. Defendant had no disciplinary issues in Indiana or for some time while living in Decatur.

¶ 26        Deloris testified, after moving to Decatur, she was in a relationship with Onie Davis, who cheated on her and used drugs and alcohol. When asked if he was violent with her, Deloris testified "[n]o, not really but had on certain occasions." The two would argue and "grab[ ] ahold of each other." These arguments occurred in defendant's presence "several times." Defendant's relationship with Davis "turned bad." Defendant was angry because his dad was not there and because Deloris would not allow him to play football. After defendant was expelled, he went to a school called "Future."

¶ 27        According to Deloris, defendant and Humphrey were cousins. They did not get into trouble until they started hanging out with older people, which included defendant's girlfriend Holly and her brother Joey Krause.

¶ 28        Since defendant was imprisoned, Deloris and defendant maintained contact via telephone. Over the last 23 or 24 years, Deloris noticed differences in defendant. Defendant was a minister. He had become a grown man. He no longer acted angry or bitter. They talked about God. He encouraged her to take care of herself. When they lived in Indiana, defendant attended church, participating in choir. Around age 15 or 16, he started hanging out with the wrong crowd

and stopped attending church.

¶ 29		Walter Williams, defendant's uncle, testified when defendant was a child, "he was a go-happy guy" who was picked on a lot because he was chubby. Defendant, however, did not act out. After defendant and Deloris moved to Decatur, Walter visited defendant twice. The last time was when defendant was 13 or 14. Defendant had physically changed a lot. He was no longer a child. He started to act out. His mother "had to argue with him a lot, whop him a lot." On cross-examination, Walter testified defendant was responsible for the younger kids. He helped his brothers and sisters and helped take care of the house.

¶ 30		Defendant testified on his own behalf. After his incarceration, defendant continued working on his education. In 1996, defendant earned his high school diploma certificate. Around 2000, defendant entered "a covenant contract with a prison" for a prison ministry. Defendant continued to be involved with that ministry. Defendant also attended seminars while imprisoned. He had a certificate for attending a two-day seminar at Menard Correctional Center (Menard) for Transforming Incarcerated Dads. Although he did not have children, defendant hoped the program would help him advise his brothers regarding his nieces and nephews. Defendant attended a two-day program with Kairos, which helped Christians "to better understand who they are as a Christian group." Defendant attended another seminar presented by a ministry to help inmates overcome their fears.

¶ 31		According to defendant, in 1994, he used cocaine, marijuana, and alcohol. At that time, defendant did not admit his substance use to the officer performing the presentence report. Since imprisonment, he completed substance abuse education in Menard.

¶ 32		Defendant was remorseful for what happened in 1994. In 1994, defendant was bitter and angry. As he aged, however, defendant learned "that was not only a twisted but

somewhat crazy idea to have in your head to use as a road to walk down." The Department of Corrections (DOC) had a law preventing inmates from contacting families of victims. Defendant could only try to make himself into a better person and, when able to see them again, apologize for the murders he committed. As to his biological father, defendant felt like he was abandoned. This led to anger and bitterness.

¶ 33 Regarding his 1998 offense, defendant stated, while in Joliet, he continued to harbor feelings of anger and bitterness. Defendant described the prison environment as follows: "You was either in the gang, or you was a victim. So join the gang, you're protected." In 1998, defendant began to escape that cycle. He "caught a staff assault" and was sent to Tamms for seven-and-a-half years. During that time, defendant was by himself and had the time to "reflect and come to the understanding that [he] made another huge mistake in [his] life." Defendant testified he had no further disciplinary reports. Defendant left Tamms in 2005.

¶ 34 Before imprisonment, defendant began spending time with older people for free alcohol, free drugs, and girls. Defendant believed he did so because he was in pain and he did not "know how to deal with that was going on in [his] life." Defendant said, "I took it out on innocent people, and I regret that."

¶ 35 On cross-examination, defendant testified he was not physically or sexually abused. He had enough food to eat and a home. Defendant dropped out of school in the eleventh grade. When the police came, defendant did not confess the crimes. Now, he admitted he killed three people and almost killed a fourth. Defendant admitted shooting Ellis and Aliabadi. Humphrey pulled the trigger on Storm and Whitacre. Before the initial sentencing, for the presentence report, defendant said he drank once and never did drugs.

¶ 36 Defendant read a statement for the trial court. He apologized to the families for

his crimes. Defendant stated he was "not the person [he] was 24 years ago, that 17-year-old angry, rejected hurt boy who dropped out of high school because he didn't care about life anymore." Defendant stated he was now a man with his GED.

¶ 37   The trial court held the following before sentencing defendant to terms of natural life imprisonment:

"First of all, I'm going to turn to the sentence in 94-CF-833 which involved the murders of Matthew Whitacre and Shane Storm. *** As I look at the other factors, about his impetuosity and level of maturity, I do not find that there is anything in the record that shows that he was immature at the time and was not able to consider the risk and consequences of his behavior, although he had dropped out of school. I do not find that he had any developmental disability in this matter.

Then we get to whether the person was subject to outside pressure, including peer pressure, familial pressure, or negative influences. The record has established that his father was not in the picture, but his mother was in the picture. There were other relatives who were in the picture in this matter. He did start hanging around with different people when he came to Decatur, including adults. That certainly does not explain the behavior in this situation.

As I look at the person's family and home environment, the testimony here today was that the mother was a loving person who

was a church going person, tried to get the defendant involved in church. When they lived in Indiana, that was the situation, that he was involved in church in Indiana. When he came to Illinois, he only went a few times, but certainly the mother tried the best she could.

When I look at his possibility of rehabilitation, first of all, when he's initially sent to the Department of Corrections, the evidence is clear that there wasn't much of a chance for rehabilitation early on. He got in trouble in 98-CF-797 for armed violence, sentenced to 10 years in the Department of Corrections. So we do get to take a look at that. He was ultimately sent to Tamms, was the evidence, for 7, 7 ½ years. I do look at the exhibits that have been submitted at this time. He has went through education here recently, that he also got his GED. He did go to some of the classes that were available while in the [DOC]. Still, 24 years later, it's hard to say that the defendant could be rehabilitated.

As I look at the circumstances of the offense, first of all, *** what we have is a situation—for $50 we have two young men who were taken down by the lake, put their hands behind their head[s], and were essentially assassinated at that stage, showing no mercy whatsoever.

Whether or not the person was able to participate in his

- 11 -

defense, there is no evidence at 17 years of age that he was not able to participate in his defense in this matter. The only evidence that I have is that he wasn't sure that when he was interviewed by the probation department, that they were a neutral party. He didn't know if they were working for the [S]tate or the police department. That certainly does not show that he could not participate with his defense in this case.

These acts of killing individuals is completely senseless. I see no mercy was shown to them whatsoever. As I look at the murder of the two individuals, Mr. Whitacre and Mr. Storm, it is clear to the Court that these murders were accompanied by exceptional[ly] brutal and heinous behavior indicative of wanton cruelty in this matter. I don't see how the Court can consider anything else in this situation for somebody who basically said go ahead and shoot the two people. I think a term of natural life imprisonment is the situation in this case. It is an appropriate sentence based on what I have seen here today. There clearly is wanton behavior in this matter. No mercy was shown to the victims in this case. So I am going to sentence the defendant to a term of natural life imprisonment on the 94-CF-833 case.

Then when we get to the 94-CF-835 case, that is the murder of Sheri Ellis. Of course, I am not going to go through the factors once again[,] but what we have is a situation where a young lady is

working at a convenience store. The defendant came into the convenience store, not only shot her once, but shot her multiple times to get a carton of cigarettes and $35. I just can't think of a more senseless act in the Court's experience. So as I look at that, I clearly find that murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Once again, the only sentence the Court sees available under these circumstances is a natural life imprisonment on that sentence without the possibility of parole.

*** I do find that two natural life sentences [are] appropriate given the facts and circumstances that the Court has seen here today."

¶ 38    This appeal followed.

¶ 39                              II. ANALYSIS

¶ 40    We begin with the second argument in defendant's appellant brief. Defendant asserts he was denied due process as the trial court failed to admonish him of the right to choose to be sentenced under the first degree murder sentencing statute as it existed on the dates of his original offenses or under the statute as it existed on the date of resentencing. Defendant contends the court failed to comply with the Statute on Statutes (5 ILCS 70/4 (West 2018)) that affords him this right.

¶ 41    The State concedes the error and maintains remand is required for an election as to the sentencing scheme. The State specifically points to the differences in the law as to the availability of a natural life sentence, noting in 1995 convictions for the first degree murder of

- 13 -

more than one person required sentences of natural life (730 ILCS 5/5-8-1(c)(ii) (West 1994)) while the same sentences were no longer available for offenders under the age of 18 (730 ILCS 5/5-8-1(c)(ii) (West 2018)).

¶ 42      We accept the State's concession. Under the Statute on Statutes, "[i]f any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect." 5 ILCS 70/4 (West 2018). In addition to the change identified by the State, the provision that allowed defendant to be sentenced to a natural life sentence based on a finding by the trial court the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty (730 ILCS 5/5-8-1(a)(1)(b) (West 1994)) has been changed to allow such a sentence only when a trier of fact finds beyond a reasonable doubt the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty (730 ILCS 5/5-8-1(a)(1)(b) (West 2018)). Moreover, since defendant's 1995 sentencing, the statutory scheme was changed to require courts to consider additional factors before sentencing an offender who was under the age of 18 at the time of the offense. 730 ILCS 5/5-4.5-105 (West Supp. 2017). These changes mitigated the sentences that could be imposed. Defendant is entitled to choose the scheme by which he is sentenced on remand. See *People v. Reyes*, 2016 IL 119271, ¶ 12, 63 N.E.3d 884; see also *People v. Hunter*, 2017 IL 121306, ¶ 54, 104 N.E.3d 358 (citing *Reyes* as establishing when a defendant's sentence is vacated on appeal and the matter is remanded for resentencing the Statute on Statues permits the defendant to elect to be sentenced under the law in effect at the time of resentencing). We will not address any other issues until defendant is resentenced.

¶ 43                    III. CONCLUSION

¶ 44        We vacate defendant's sentences and remand for resentencing.

¶ 45        Vacated and remanded.