NOTICE

Decision filed 10/16/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220750-U

NOS. 5-22-0750, 5-22-0751 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | Nos. 94-CF-833, 94-CF-835 |
| | ) | |
| CONTRELL D. WILLIAMS, | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and McHaney concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court did not err in resentencing as it applied the required mitigating factors for juvenile offenders and the circuit court did not abuse its discretion by sentencing the juvenile defendant to life terms in prison for multiple first degree murder convictions.

¶ 2   When the defendant, Contrell D. Williams, was 17 years old, he committed three first degree murders. The defendant was charged with those murders in 1994, in two separate cases, and subsequently convicted and sentenced to three terms of life in prison.

¶ 3   In 2013, the defendant petitioned for postconviction relief after the Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012), determined that a mandatory life sentence without parole for a person under 18 years old violated the eighth amendment's prohibition against cruel and unusual punishment. The defendant received a new sentencing hearing in 2018, and he was

1

resentenced to three life terms in prison. On appeal, the State conceded error where the defendant was not admonished of his right to choose whether to be sentenced under the statute in effect on the date of the offense or as it existed at resentencing and the matter was remanded for a new sentencing hearing. See *People v. Williams*, 2021 IL App (4th) 180676-U.

¶ 4   In 2022, on remand, the defendant was again sentenced to life terms in prison for each count of first degree murder. The defendant appeals the 2022 sentencing decision and argues that his natural life sentences for offenses committed when he was 17 years old violate the eighth amendment and the proportionate penalties clause of the Illinois Constitution. For the following reasons, we affirm the circuit court's sentencing decision.

¶ 5                                I. BACKGROUND

¶ 6                                A. Criminal History

¶ 7   In 1994, the defendant was involved in a series of crimes which occurred over the span of a few weeks. The crimes occurred on July 28, 1994, August 10, 1994, and September 5, 1994. After the defendant was incarcerated, he committed armed violence as part of a gang affiliation.

¶ 8                          1. *Attempted Murder of Mike Aliabadi*

¶ 9   During the July 28, 1994, incident, the defendant and two of his cousins robbed Ali's Market by taking the cash drawer and demanded the keys to a truck owned by the store owner, Mike Aliabadi. Aliabadi gave them the keys to the building and not to his truck. The defendant shot Aliabadi in both arms after discovering that the key to the truck did not work.

¶ 10   Aliabadi survived the shooting. The defendant was convicted of attempt murder and armed robbery for this incident. See *People v. Williams*, No. 94-CF-834 (Cir. Ct. Macon County, June 19, 1995).

¶ 11     2. *First Degree Murders of Shane Storm and Matthew Whitacre*

¶ 12     On August 10, 1994, the defendant and his cousin, Tyrone Humphrey, executed two teenaged boys, Shane Storm and Matthew Whitacre. The defendant and Humphrey had asked Storm and Whitacre for a ride. The defendant proceeded to use a gun to rob the teenagers of $50. The teenagers sat in the back of their car while the defendant drove to a lake. The defendant then directed Humphrey to shoot Storm and Whitacre at close range. Afterwards, the defendant drove to the area of Torrence Park and set the car on fire to prevent the police from finding their fingerprints.

¶ 13     Storm and Whitacre's bodies were found face down with their hands behind their heads. Whitacre's cause of death was two gunshot wounds to the head and Storm's death was due to three gunshot wounds to the head.

¶ 14     After a jury trial, the defendant was found guilty of two counts of first degree murder in *People v. Williams*, No. 94-CF-835 (Cir. Ct. Macon County, June 21, 1995). He was subsequently sentenced to two natural life terms in the Illinois Department of Corrections for the murders of Storm and Whitacre.

¶ 15     3. *First Degree Murder of Sheri Ellis*

¶ 16     The defendant murdered Sheri Ellis on September 5, 1994. Ellis worked as a cashier at a Hucks Gas Station. The defendant and Humphrey robbed Hucks of approximately $30 and a carton of cigarettes. The defendant shot Ellis, removed a VCR recording the shooting, and then shot Ellis two more times before leaving the gas station.

¶ 17     Ellis was found face down in a pool of blood and died at the hospital from the gunshot wounds. The bullets from the crime scene involving Aliabadi, Storm and Whitacre, and Ellis were determined to be fired by the same gun.

3

¶ 18    After a jury trial, the defendant was found guilty of first degree murder in *People v. Williams*, No. 94-CF-833 (Cir. Ct. Macon County, December 20, 1994). He was subsequently sentenced to a natural life term in the Illinois Department of Corrections for the murder of Ellis.

¶ 19                          4. *Armed Violence*

¶ 20    After the defendant was incarcerated, he joined a gang, the Latin Kings. When the defendant was in his 20s, he stabbed a correctional officer as part of his gang initiation. The defendant was found guilty of armed violence in *People v. Williams*, No. 98-CF-797 (Cir. Ct. Will County, August 16, 1999). After that incident, the defendant was transferred to Tamms Correctional Center where he served 7.5 years in solitary confinement.

¶ 21                  B. Postconviction Petition and Resentencing

¶ 22    The defendant filed a postconviction petition challenging the constitutionality of his life sentences in People v. Williams, No. 94-CF-833 (Cir. Ct. Macon County) and People v. Williams, No. 94-CF-835 (Cir. Ct. Macon County). The circuit court held a resentencing hearing on September 28, 2018, on both matters. The circuit court considered the original presentencing investigation report (PSI) as well as an updated PSI.

¶ 23    The State presented evidence in aggravation including the testimony of retired police officer Patrick McElroy. McElroy testified that he was aware of the attempted murder of Aliabadi and the murders of Storm, Whitacre, and Ellis and provided testimony detailing each offense. Several victim impact statements were also admitted into evidence.

¶ 24    The defense provided evidence in mitigation. The defendant's mother, Deloris Williams, testified that the defendant's father never had contact with the defendant. The defendant began having problems in school in the ninth or tenth grade and was transferred from school into an alternative school for disciplinary reasons. The defendant then "started hanging out with the guys

4

on the streets and stuff, he changed." Deloris was in a dating relationship when the defendant was in high school, and her boyfriend had been under the influence of drugs around the defendant. She denied drug use or alcohol abuse.

¶ 25    The defendant testified that he had received his G.E.D. in 1997, completed a two-day seminar on transforming incarcerated fathers, completed substance abuse education, and had been involved with the prison ministry since 2000. In 1995, the defendant was afraid of communicating with adults because he believed that everyone was against him. When the defendant was a juvenile, he had used cocaine, cannabis, and alcohol. He denied being physically or sexually abused as a child. The defendant had felt rejected by his father, he acted out in his teens, and did not know how to deal with his life. He has been remorseful for what occurred in 1994. The defendant additionally provided a statement in allocution and apologized to the victims' families for his crimes.

¶ 26    After hearing and considering arguments by counsel, the circuit court stated that it considered the statutory factors of aggravation and mitigation, the evidence presented, arguments, the defendant's statement of allocution, and the victim impact statements. The circuit court resentenced the defendant to terms of life imprisonment in both cases.

¶ 27                                      C. Appeal - 2018

¶ 28    In a consolidated appeal, the defendant appealed the sentencing decision and argued that he was entitled to resentencing because (1) the circuit court failed to find him permanently incorrigible, failed to properly weigh the sentencing factors before imposing life sentences, and argued for a sentence of no more than 40 years of imprisonment at resentencing; (2) the circuit court failed to admonish him of his right to choose to be resentenced under the first degree murder sentencing statute in effect on the date of the offense or the statute as it existed at resentencing;

5

(3) his sentences violated the holding of *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and (4) he was denied effective assistance of counsel. See *Williams*, 2021 IL App (4th) 180676-U. The State conceded the defendant's second argument, and the cause was remanded for a new sentencing hearing to allow the defendant to elect to be sentenced under the law in effect at the time of resentencing. See *Williams*, 2021 IL App (4th) 180676-U.

¶ 29                                    D. Resentencing Hearing

¶ 30    On remand, the defendant elected to be resentenced pursuant to the 2022 sentencing laws. The circuit court reviewed the mitigation materials provided by the defense prior to the resentencing hearing and considered evidence presented in the prior sentencing hearing.

¶ 31    Dr. James Garbarino, an expert in the field of developmental psychology, testified for the defense. Dr. Garbarino had drafted a report dated November 24, 2021, after corresponding with the defendant to understand his life experiences. Dr. Garbarino testified that he measured childhood trauma experiences and adversity through the Adverse Child Experience Scale (ACE scale). Two-thirds of Americans score a zero or a one on the ACE scale. A person receiving a score of four or five has faced "a lot of adversity."

¶ 32    The defendant had scored a 6 out of a 10-point ACE scale. The defendant's score of six on the ACE scale implied that "he was carrying a lot of emotional baggage growing up." Dr. Garbarino considered that the defendant had suffered emotional abuse, physical abuse, and emotional neglect. Additionally, the defendant's parents were separated or divorced, and he did not have a relationship with his father. The defendant's mother abused substances; she smoked marijuana.

¶ 33    Dr. Garbarino testified that he was familiar with the Supreme Court case of *Miller*, 567 U.S. 460, and he considered the *Miller* factors when he organized his report. Dr. Garbarino

believed that the *Miller* decision incorrectly found that the nature of the crime was evidence of whether somebody was irreparably corrupt. Rather, he was unaware of any evidence that linked the severity of a teenager's crime to their potential for future rehabilitation. Dr. Garbarino opined that the severity of the crime was not developmentally significant, and an individual may be capable of rehabilitation despite the severity of the crime.

¶ 34    Dr. Garbarino considered that there would have been little evidence of any potential for rehabilitation had the defendant's potential for rehabilitation been determined before the defendant turned 22. Dr. Garbarino considered that the defendant had assaulted a corrections officer when the defendant was in his 20s in prison and involved in a gang. However, the defendant underwent an "existential crisis" and "religious transformation" where he began a "positive path." Dr. Garbarino considered "in retrospect, it seems that [the defendant] was not in the rarest of category" of people that were not capable of rehabilitation.

¶ 35    Dr. Garbarino additionally believed that an appropriate sentence for a teenager convicted of murder should be approximately 20 years in order for the teenagers to mature and rehabilitate themselves. Shorter sentences would result in a high recidivism rate. Dr. Garbarino was unaware of a study using his 20-year sentence recommendation and based his opinion on his participation in *Miller* resentencing cases.

¶ 36    Dr. Garbarino testified that there are some individuals who are not capable of rehabilitation. He was also familiar with cases involving severe crimes and defendants who were rehabilitated. Dr. Garbarino opined that there are two groups of people that are at high risk for never rehabilitating who are assessed as being psychopath and infant torture victims who never became a normal person. The meaning of psychopath is "moral insanity" or a person with "no moral framework," "no empathy," and "no compassion." Children who were diagnosed as sociopath

teenagers were not necessarily sociopath adults, but psychopaths, in general, were incapable of rehabilitation after committing murder.

¶ 37   Dr. Garbarino considered that the defendant's behavior in the murders committed was "clearly sociopathic." The defendant had no sense of right or wrong when he was a teenager. At this point in the defendant's life, however, he understood that the murders were a "moral travesty," and he was remorseful. Dr. Garbarino testified that the defendant was rehabilitated.

¶ 38   Dr. Garbarino had not formally screened the defendant for psychopathy because Dr. Garbarino was not a clinical psychologist. Dr. Garbarino testified that a trait of a psychopath was "impression management," which is "the ability to understand how to present yourself to someone in a positive light." It was possible for a psychopath to present a false impression that he had been rehabilitated but would kill again. Dr. Garbarino did not believe that was the issue in this case where the defendant had maintained a different behavior over a long period of time.

¶ 39   Dr. Garbarino had considered in his written report that the defendant had a "war zone mentality," which compared high crime urban neighborhoods to areas where there were civil wars. Dr. Garbarino, however, testified that his "war zone mentality" analysis was the weakest part of his report because the defendant had lived in Decatur, Illinois, and not an area of unusually high crime.

¶ 40   Dr. Garbarino additionally testified that the defendant's ACE score of six was based on self-reporting. The defendant's score included self-reporting that the defendant's mother used street drugs, which would have included marijuana use. The questionnaire did not specify marijuana use. Dr. Garbarino additionally testified that he was unaware that the defendant's mother had testified during the 2018 sentencing hearing that she did not drink or do drugs. He believed that it was common for parents to under report drinking and drug use. Dr. Garbarino additionally

8

explained that children hit with extension cords or switches would not report that they were physically abused if they believed it was normal punishment. Overall, Dr. Garbarino opined that the defendant had been rehabilitated.

¶ 41 The State presented several victim impact statements. Kevin Moran, Ellis's nephew, testified that Ellis was killed in a "violent horrific manner" and believed that the defendant would kill again if released. Carol Ellis read several impact statements from her family members. She read a statement that the defendant had "killed in cold blood" and "executed them with no remorse." The defendant should serve a full life sentence due to the "heinous nature" of his crimes. Carol considered the defendant a "serial killer" who would have continued on a killing spree if he had not been caught. Matthew Whitacre's mother also made a victim statement that the defendant killed random people that had agreed to give him a ride. She requested that the defendant complete his life sentence. The circuit court took judicial notice of the prior sentencing hearing at the State's request.

¶ 42 The defense presented evidence in mitigation. The defendant's cousin, Jesse Reynolds, testified that he was six years old when the defendant was incarcerated. Jesse viewed the defendant as a mentor or a "big brother," as the defendant provided encouragement. Jesse had earned a bachelor's degree, a master's degree, and was completing a doctorate program.

¶ 43 The defendant provided a statement of allocution where he apologized for the murders that he committed. He stated that he had changed his life.

¶ 44 The State argued that the circuit court should reimpose the defendant's life sentences without the possibility of parole after considering *Holman*.[1] The defendant had committed the crimes shortly before his eighteenth birthday. The State considered the defendant's actions were

---

[1]*People v. Holman*, 2017 IL 120655.

9

either a killing spree or the actions of a serial killer with significant periods of time between the killings. A codefendant who was involved in the first robbery of Mike Aliabadi refused to participate in the subsequent murders. The State argued that the defendant created the familial pressure and had the most influence over his codefendants. The defendant did not have any issues or inability to deal with prosecutors or assist in his defense with his own attorneys. The defendant knew to remain silent when interviewed by the police.

¶ 45　　The State additionally argued that Dr. Garbarino only provided a partial explanation of the defendant's prospects for rehabilitation, and he was not a clinical psychologist. Dr. Garbarino was only able to provide impressions. The victim impact statements relayed that the defendant committed a spree of murders because he wanted to kill. If the defendant had not been caught, it was likely that he would have committed more murders. The State argued that it was a risk to consider that the defendant was rehabilitated or capable of rehabilitation after committing cold and calculated murders. The circuit court was required to consider how heinous the offenses were when sentencing the defendant.

¶ 46　　The defense argued that a life sentence for a juvenile offender is a disproportionate sentence for all but the rarest of children and that children who had committed heinous crimes were capable of change. The defense argued that the defendant was 17 when he committed the murders, and his understanding of risks and consequences were not those of an adult. The defendant was subject to outside pressures including pressure from gang members, which led him to commit a violent act when he was first incarcerated. The defendant experienced physical and emotional harm during his childhood. He felt unloved, alone, and never knew his father. The defense agreed with the State that the defendant had a meaningful opportunity to participate in his defense. The defense argued that the defendant had expressed genuine remorse for his actions.

¶ 47    The defendant presented evidence of rehabilitation. He had received his G.E.D. while incarcerated, became involved in the prison ministry, and completed parenting classes to help advise his nieces and nephews. The defendant worked on these accomplishments prior to the possibility of a resentencing hearing. Additionally, the science of adolescent brain development had shown that a brain does not mature until a person reaches an age close to 25 years old. The defendant was convicted of armed violence against a correctional officer while he was still developing mentally, prior to the age of 25. Since that incident, which had occurred approximately 23 years ago, the defendant had a clean disciplinary record. The defendant began to rehabilitate himself prior to believing that he would receive a resentencing hearing. The defense argued that the defendant was not irredeemable. The defense requested a sentence for a period of years rather than a life sentence without the possibility of parole.

¶ 48    The circuit court considered the statutory factors of aggravation, mitigation, arguments of counsel, the defendant's statement of allocution, the victim impact statements, the PSI, and Dr. Garbarino's report, and the circuit court was familiar with the prior sentencing hearing. The circuit court addressed that when considering factors in mitigation, and the court was required to consider *Miller*, *Holman*, and section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2020)), where the defendant was 17 years old when he committed the crimes.

¶ 49    The circuit court noted that it had considered Dr. Garbarino's testimony regarding the defendant's level of maturity when the defendant was 17 years old. The circuit court considered the factors in mitigation in determining the appropriate sentence for a juvenile and found that the defendant did not consider the consequences of killing people; there may have been familial and peer pressure because of his cousins' involvement; the defendant dealt with some mental abuse in his home life; the defendant dropped out of school in the tenth grade and obtained a G.E.D. while

11

incarcerated; and that no evidence was presented that the defendant was unable to participate in his defense.

¶ 50 The circuit court considered whether the defendant was capable of rehabilitation based on Dr. Garbarino's testimony that 95% of juveniles who commit murder at 17 were capable of rehabilitation after 20 years in prison. The circuit court, however, had to consider the circumstances of the offense and degree of participation in the offense. The circuit court found that the murders were extremely brutal, and the defendant played a significant role in committing the crimes.

¶ 51 The circuit court considered factors in aggravation and characterized the murders as "brutal" and "basically assassinations." The circuit court considered that Aliabadi was shot on July 29, 1994, then a couple weeks later, on August 10, 1994, Storm and Whitacre were both shot in the back of their heads. Three weeks later, Ellis was "basically executed." Then, five years later, the defendant stabbed a prison guard while the defendant was incarcerated. The circuit court found that there was irretrievable depravity, the defendant was permanently incorrigible, and life sentences without parole were necessary in both cases. The circuit court did not find that the defendant was subject to rehabilitation. The defendant was resentenced to life without the possibility of parole in both cases.

¶ 52 The circuit court considered a motion to reconsider the defendant's sentence where the defendant had argued that his sentence was excessive and an abuse of discretion. The circuit court denied the motion to reconsider. This consolidated appeal followed.

¶ 53                                          II. ANALYSIS

¶ 54 On appeal, the defendant claims that his natural life sentences for offenses committed when he was 17 years old are excessive under the eighth amendment and the proportionate penalties

clause of the Illinois Constitution. See U.S. Const., amend. VIII; Ill. Const. 1970, art. I, § 11. The defendant acknowledges that he failed to raise constitutional arguments in his motion to reconsider the sentencing decision and seeks plain-error review.

¶ 55　　A claim of sentencing error is forfeited if a defendant does not contemporaneously object and file a written postsentencing motion raising the issue before the circuit court. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). However, forfeited claims may be reviewed under the plain-error doctrine, which provides a narrow and limited exception. *Hillier*, 237 Ill. 2d at 545. Under the plain-error rule, a defendant must first show that a clear or obvious error occurred. *Hillier*, 237 Ill. 2d 539 at 545. "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545.

¶ 56　　The eighth amendment prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. Inherent in the prohibition of cruel and unusual punishment is the concept of proportionality. *Graham v. Florida*, 560 U.S. 48, 59 (2010). A criminal sentence must be "graduated and proportioned to both the offender and the offense." *People v. Davis*, 2014 IL 115595, ¶ 18.

¶ 57　　The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To be meritorious on a claim of a proportionate penalties clause violation, "a defendant must show either that the penalty imposed is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community; or that it differs from the penalty imposed for an offense containing the same elements." *People v. Klepper*, 234 Ill. 2d 337, 348 (2009). Whether a sentence violates the proportionate penalties clause is reviewed *de novo*. *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 63.

¶ 58    When a juvenile commits a serious offense, "there is a genuine risk of disproportionate punishment." *People v. Holman*, 2017 IL 120655, ¶ 33. For sentencing purposes, juveniles are considered constitutionally different from adults. *Miller*, 567 U.S. at 471. A sentence for a juvenile offender is unconstitutional where "(1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *People v. Buffer*, 2019 IL 122327, ¶ 27.

¶ 59    The circuit court, however, is not prohibited from sentencing a juvenile to a natural life sentence without parole, but the court must first consider " 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' " *Montgomery v. Louisiana*, 577 U.S. 190, 208 (2016) (quoting *Miller*, 567 U.S. at 480). The circuit court must determine that " 'the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation' " when imposing juvenile life sentences. *Holman*, 2017 IL 120655, ¶ 46. *Miller* requires that, before imposing such a sentence, a trial court must consider youth and its attendant circumstances. *Miller*, 567 U.S. at 483, 489. Illinois codified the *Miller* factors. See 730 ILCS 5/5-4.5-105(a) (West 2020). As such, before sentencing a juvenile defendant, a sentencing court must consider the following factors in mitigation:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;
>
> (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;
>
> (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;
>
> (4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

14

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2020).

¶ 60    In this case, the circuit court considered that the defendant was a juvenile, 17 years old, when he committed the offenses. The circuit court additionally considered Dr. Garbarino's testimony regarding the defendant's level of maturity when the defendant was 17 years old. The circuit court found that the defendant did not consider the consequences of killing people; there may have been familial and peer pressure because of his cousins' involvement; the defendant dealt with some mental abuse in his home life; the defendant dropped out of school in the tenth grade and obtained a G.E.D. while incarcerated; and no evidence was presented that the defendant was unable to participate in his defense.

¶ 61    The circuit court specially addressed Dr. Garbarino's opinion that most juveniles who had committed murder were capable of rehabilitation after spending 20 years in prison. In this case, the defendant had stabbed a correctional officer five years after the murders as part of a gang initiation.

¶ 62    We note that while Dr. Garbarino opined that the defendant was rehabilitated, and was thus capable of rehabilitation, Dr. Garbarino testified that it was difficult to determine whether a person was irreparably corrupt. Dr. Garbarino was not a clinical psychologist, and the defendant had not been screened for psychopathy. Dr. Garbarino did not believe that the *Miller* decision was correctly

15

decided nor that the nature of the crime was evidence of whether somebody was irreparably corrupt.

¶ 63 The circuit court was required to consider the circumstances of the offenses when assessing the factors in mitigation for juvenile offenders. The defendant had committed "extremely brutal murders," and it was clear that the defendant had a "high role in this situation." The circuit court found irretrievable depravity based on the circumstances of the offenses and that the sentencing imposed was necessary to protect the public.

¶ 64 The defendant argues that a *de novo* standard of review should apply to determine whether an individual's constitutional rights have been violated. See *People v. Burns*, 209 Ill. 2d 551, 560 (2004). The State, on the other hand, argues that the circuit court made the required findings in mitigation for juvenile offenders and the defendant's argument is merely an excessive sentencing argument. A sentencing decision is reviewed for an abuse of discretion. *People v. Patterson*, 2017 IL App (3d) 150062, ¶ 31. We find that the circuit court applied the appropriate mitigating factors for juvenile offenders and the abuse of discretion standard applies where defendant's challenge to his sentence amounts to an excessive sentence challenge.

¶ 65 A circuit court imposing a sentence within the statutory limits will only be deemed excessive and an abuse of discretion where the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). A circuit court has "broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 66 Substantial deference is given to the circuit court's sentencing decision because the sentencing judge "is in a much better position to consider factors such as the defendant's

16

credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. "The spirit and purpose of the law are promoted when the trial court's sentence reflects both the seriousness of the offense and gives sufficient consideration to the defendant's rehabilitative potential." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 28. While the court must consider defendant's rehabilitative potential and any mitigating factors that are present, it is not required to give those factors more weight than it gives aggravating factors. *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 32. Rather, the seriousness of the offense is one of the most important factors for the sentencing court to consider. *Etherton*, 2017 IL App (5th) 140427, ¶ 28. Given this record, we find the court did not abuse its discretion and the defendant's sentence was not greatly at variance with the spirit and the purpose of the law.

¶ 67    As noted above, under both prongs of the plain-error doctrine, the defendant must first show a clear and obvious error occurred. *Hillier*, 237 Ill. 2d at 545. Here, no error is shown, and therefore, the procedural default will be honored. See *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). As such, we affirm the sentences imposed by the trial court.

¶ 68                                      III. CONCLUSION

¶ 69    For the foregoing reasons, we affirm the sentencing decision of the circuit court of Macon County.

¶ 70    Affirmed.