NOTICE
Decision filed 06/24/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230408-U

NO. 5-23-0408

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 96-CF-409 |
| | ) | |
| LABRON C. NEAL, | ) | Honorable |
| | ) | Tyler R. Edmonds, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CLARKE* delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1  *Held*: The defendant's sentence is affirmed where we find that (1) the defendant's sentence of natural life in prison was authorized by statute; (2) the resentencing court honored the defendant's election to be sentenced under the 1996 statute; (3) the resentencing court did not abuse its discretion when it sentenced the defendant to natural life; (4) the defendant's sentence was not unconstitutional as applied to him under the eighth amendment; and (5) the defendant's sentence did not violate the proportionate penalties clause.

¶ 2  In August of 1996, the defendant, Labron C. Neal, a then 17-and-a-half-year-old, shot both Terrance Mitchell and Austin Campbell to death. In September of 1997, a jury found the defendant guilty of first degree murder. The trial court sentenced him to natural life in prison, a sentence that

_____

*Justice Moore was originally assigned to the panel before his retirement. Justice Clarke was substituted on the panel and has listened to oral arguments and read the briefs.

1

was mandated by statute because the defendant killed more than one victim. See 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996).

¶ 3    In 2012, the United States Supreme Court held that a mandatory sentence of life in prison without parole violates the eighth amendment (U.S. Const., amend. VIII) when imposed for a crime committed by a juvenile. See *Miller v. Alabama*, 567 U.S. 460, 479 (2012). Subsequently, the defendant filed a postconviction petition, arguing that his sentence was unconstitutional under *Miller*. After a lengthy resentencing hearing during which the resentencing court heard and considered substantial evidence concerning the *Miller* factors, the court imposed a discretionary natural life sentence. The defendant filed a motion to reconsider the sentence, which the court denied.

¶ 4    On appeal, the defendant raises five issues. First, the defendant contends that the resentencing court lacked the statutory authority to impose a discretionary natural life sentence. Second, the defendant contends that he was not properly admonished of his right to elect to be sentenced under the statute in effect at the time of the offense or the law that was in effect at the time of his resentencing. Third, the defendant contends that the resentencing court abused its discretion in imposing a discretionary natural life sentence. Fourth, the defendant contends that the defendant's sentence violates the eighth amendment, asserting that the resentencing court failed to meaningfully consider his youth and its attendant characteristics, as required by *Miller* and subsequent cases interpreting *Miller*. Fifth, and finally, the defendant contends that his discretionary natural life sentence violates the Illinois Constitution's proportionate penalties clause, arguing that the resentencing court failed to properly consider the relevant characteristics associated with his youth at the time of the offenses and failed to sentence him with the goal of rehabilitation. For the reasons that follow, we affirm the defendant's sentence.

¶ 5                                          I. BACKGROUND

¶ 6      We limit our recitation to the facts necessary for the disposition of this appeal. Additional

details relevant to specific claims on appeal will be used in the analysis section of each claim as

necessary. On September 9, 1997, the defendant was convicted of first degree murder for the

August 11, 1996, shooting deaths of Terrance (age 16) and Austin (age 15). The defendant was

17-and-a-half years old at the time of the murders.

¶ 7      On October 21, 1997, the trial court imposed a mandatory life sentence pursuant to section

5-8-1(a)(1)(c)(ii) of the Uniform Code of Corrections (Code) (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West

1996)). This court affirmed the convictions on direct appeal, and the Illinois Supreme Court denied

leave to appeal. *People v. Neal*, 309 Ill. App. 3d 1100 (2000); *People v. Neal*, 189 Ill. 2d 672

(2000). On October 19, 2000, the defendant filed a postconviction petition, which the circuit court

dismissed as *res judicata*. This court affirmed the dismissal in 2002. *People v. Neal*, 332 Ill. App.

3d 1153 (2002).

¶ 8      On December 30, 2016, the defendant sought leave and filed a successive postconviction

petition, arguing that his mandatory life sentence violated his eighth amendment rights pursuant

to *Miller*. After counsel filed an amended petition, the circuit court vacated the sentence and

granted a new sentencing hearing. The defense requested, and the resentencing court granted,

bifurcation so that the sentencing-range issue could be addressed separately. As it relates to the

applicable sentencing range, the defendant argued that his maximum sentence under the 1996

statute was 40 years because (1) mandatory life without parole was unconstitutional as applied to

him because he was 17-and-a-half years old at the time of the crime, (2) he was not permanently

incorrigible and could not otherwise be sentenced to life without parole under the statute, and (3) a

sentence over 40 years would constitute *de facto* life under *People v. Buffer*, 2019 IL 122327.

                                                3

Defense counsel also stated that the defendant elected to be sentenced under the 1996 law, which was in effect at the time the offenses were committed.

¶ 9    Throughout amendments to the memorandum and oral argument on the issue, the defense further contended that discretionary life under section 5-8-1(a)(1)(b) of the Code (730 ILCS 5/5-8-1(a)(1)(b) (West 1996)) was unavailable because no jury had found the murders involved brutal or heinous conduct indicative of wanton cruelty, and such a finding could not be made posttrial without violating *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The defense also argued that the resentencing court lacked the authority to read section 5-8-1(a)(1)(c)(ii) as permitting a discretionary life sentence.

¶ 10    The State argued that the defendant remained eligible for a sentence of 20 to 60 years or natural life because *Miller* only invalidated the mandatory imposition of life without parole on juvenile defendants, not the sentence as a whole. Relying on *People v. Walker*, 136 Ill. App. 3d 177 (3d Dist. 1985), and *People v. Abernathy*, 189 Ill. App. 3d 292 (1st Dist. 1989), the State asserted that the resentencing court could impose a natural life sentence under section 9-1(b) of the Criminal Code of 1961 (720 ILCS 5/9-1(b) (West 1996)).

¶ 11    On September 2, 2021, the resentencing court issued a written order finding that it could impose concurrent terms of 20 to 60 years pursuant to "730 ILCS 5/5-8-1(a)(1)(a)" or after considering the defendant's youth and its attendant characteristics, impose a discretionary life sentence pursuant to "730 ILCS 5/5-8-1(a)(1)(c)(ii)." The defendant moved to reconsider, challenging the resentencing court's authority to impose a natural life sentence, which the court denied.

¶ 12    At the resentencing hearing on March 28, 2023, the State read aloud the "Statement of Facts" filed on October 28, 1997, by the then-State's attorney. The document asserted that the

4

defendant had "in his short life, dedicated himself to a life of crime," and stated that the defendant was placed on probation but "did not use that opportunity to correct his behavior." It further noted that the defendant's time in the Illinois Department of Corrections' Juvenile Division "did not impress upon him that criminality was not the path he should take." The then-State's attorney also commented that he had "never seen an individual as cold-blooded or calculated as the defendant."

¶ 13 Following opening statements, the State called Eugene Fought, an intelligence analyst with the Federal Bureau of Prisons' National Gang Unit. The resentencing court recognized Fought as an expert in corrections and gang activity in custodial settings. Fought testified that the Gangster Disciples are "one of the more structured" prison gangs. Fought explained that they often attempt to control inmate commissaries, which function as a form of currency within prisons, because whoever controls the commissaries also controls the activities that occur within the prison. Fought also testified that the gang has operated fraudulent charities and businesses, directing proceeds into inmate trust accounts to launder funds. According to Fought, members also use alternative names and terminology for their groups to manipulate or obscure their affiliation with the Gangster Disciples.

¶ 14 The State presented testimony next from Detective Stacy Stark of the Jackson County Sheriff's Department. Detective Stark interviewed and took the statements of two individuals, whose identities were withheld, who were housed with the defendant at the Jackson County Jail while the defendant was awaiting resentencing. Their statements were admitted into evidence. One individual identified the defendant as a Gangster Disciple; the other described the defendant as a retired member who did not appear retired. Through the interviews, Detective Stark learned that the individuals observed the defendant taking control of the commissary within the cell block, including purchasing commissary items for others he had recruited. According to one of the

statements, the individuals the defendant recruited were young black males, and once recruited, they could purportedly use the defendant's name in prison. Detective Stark also learned that the defendant created an organization called the Fallback Movement. Although it was presented as an initiative encouraging people to leave gang and drug culture, the two individuals believed the defendant continued to display gang-related behavior and operated in both roles, promoting the Fallback Movement while still following Gangster Disciple practices.

¶ 15 The State then called Rodney Morris, the uncle of Terrance, and Brooks Campbell, the younger brother of Austin. Morris testified that he was unaware of any apology from the defendant to Terrance's family, despite reports of an apology being made over the radio in the mitigation report. Brooks similarly testified that the defendant had not apologized to Austin's family. Brooks added that the defendant's reputation in the community was that of a violent and aggressive Gangster Disciple and a murderer.

¶ 16 The defense began its case by calling Sergeant Timothy Williamson of the Jackson County Sheriff's Office. Sergeant Williamson testified that while the defendant awaited sentencing, he saw the defendant one to three days per week and had no disciplinary, behavioral, or safety concerns. On cross-examination, he clarified that he typically saw the defendant for only one to three minutes during each of those encounters. Sergeant Williamson denied knowledge of the defendant controlling the commissary or requesting to handle matters within B-dorm himself. On recross, the State read a portion of the mitigation report indicating the defendant asked officers to allow detainees to resolve their own disputes within B-dorm. Sergeant Williamson said he had not previously heard that information.

¶ 17 The defense next called Rodney Brooks, who had been detained with the defendant in B-dorm. Rodney testified that he was detained in the Jackson County Jail on charges of aggravated

6

battery with a firearm and attempted murder, for which he was later found not guilty. Rodney described his time in B-dorm as "life-changing" and stated he believed the defendant had once been a Gangster Disciple but had converted to Islam and did not display gang-related behavior. Rodney said the defendant introduced him to the Fallback Movement and that he never felt manipulated by the defendant. On cross-examination, Rodney acknowledged that he had served time in federal prison and had been around gang activity there, though he could not recall specific gang names.

¶ 18 The defense then presented expert testimony from Dr. James Garbarino, a developmental psychologist retained by the defendant and his family. Dr. Garbarino reviewed the defendant's social history, presentence investigation (PSI) report, interview recordings, and other materials. Dr. Garbarino also conducted his own interviews with the defendant to assess how the defendant's life experience influenced his development and behavior before his incarceration.

¶ 19 Dr. Garbarino testified that a significant portion of his evaluation relied on the defendant's self-reporting, which was validated by the defendant's social history and interviews that were provided by mitigation specialist Dr. Tim Semmerling, who prepared the mitigation report.

¶ 20 Dr. Garbarino also administered the Adverse Childhood Experience Scale (ACES) questionnaire, a 10-question test to assess the defendant's experience with adversity. Dr. Garbarino explained that ACES responses are strongly correlated with depression, suicide risk, substance abuse, and other negative outcomes. On cross-examination, Dr. Garbarino acknowledged that the ACES instrument is more accurately described as a "transparent survey" rather than a test, as it does not meet professional testing criteria.

¶ 21 Dr. Garbarino testified that based on the defendant's answers, it was "very likely that he would develop significant problems" with substance abuse, depression, suicidal thoughts and

7

behavior, as well as violent behavior based on his childhood trauma. However, Dr. Garbarino indicated some children can recover from severe trauma, stating that there are individuals who are "profoundly traumatized" and their process to overcome the trauma is "extremely difficult, you might even call it miraculous," but in "ordinary situations," recovery is possible.

¶ 22    Dr. Garbarino opined that "since committing these terrible crimes," based on the defendant's "self-reports and from reading the reports of others," the defendant has "transcended" his early experiences. On cross-examination, Dr. Garbarino acknowledged that he had not implemented measures to detect deception and that he sought corrections and additions from the defendant before completing his report. Dr. Garbarino also acknowledged that the defendant's prior behavior appeared to reflect an "entrenched pattern of criminal conduct." Still, he did not view the defendant as a rare incorrigible youth at the time of the murders.

¶ 23    The defense next called Jerry Baldwin, the defendant's former prison counselor at Statesville Correctional Center. Baldwin testified that he never had problems with the defendant and observed no concerning behavior. On cross-examination, Baldwin stated he did not know the defendant was a Gangster Disciple. He noted that high-ranking gang members sometimes present themselves favorably to avoid attention, but he did not interpret the defendant's conduct as indicative of gang affiliation.

¶ 24    The defense then presented testimony from mitigation specialist Dr. Semmerling. Although not certified as an expert, he testified regarding his methodology and findings. He stated that he interviewed the defendant 19 times, conducted 43 additional interviews, and reviewed PSI reports, school records, criminal records, motions, news articles, and Fallback Movement materials. Dr. Semmerling explained that he recorded statements provided by interviewees, including the defendant, when they appeared plausible. He acknowledged that he excluded some information

8

already contained in other documents and reiterated that his goal was to produce a mitigation report.

¶ 25    Regarding the defendant's social history, Dr. Semmerling testified that the defendant's family faced financial instability and required assistance for housing, food, and toys. He reported that the defendant had poor school attendance. According to the defendant, part of his absenteeism stemmed from fear, as he had seen his father beat his brother for academic struggles, and at times, his mother kept him home to spend time with her.

¶ 26    Dr. Semmerling also testified that the defendant was exposed to abuse and violence within the home. Dr. Semmerling described an incident where the defendant went with his older brother Cedrick to purchase a gun. Before paying for the gun, Cedrick turned the gun on the man and told him to "run." The defendant reportedly thought this was cool. In the mitigation report, the defendant stated that he recalled a time when a neighbor verbally chastised his sisters; he explained that his mother, in response, went to the neighbor's house with a broken table leg and struck the woman on the head with the table leg. The mitigation report also states that when the defendant was six years old, his father "pointed his rifle at Department of Children and Family Services representatives" who came to their house. Dr. Semmerling also reported that the defendant explained that his mother would "choose to pray over problems rather than confront them with counseling or with medical help." While it was reported and documented in his PSI that the defendant's family failed to place him in court-ordered counseling as a child, there were no reports regarding his mother striking the neighbor with a broken table leg or of his father pointing a gun at Department of Children and Family Services representatives.

¶ 27    Regarding gang involvement, Dr. Semmerling testified that the defendant was introduced to the Gangster Disciples by his brothers. During cross-examination, Dr. Semmerling explained

that the Gangster Disciples were "impressed" by the defendant's leadership qualities, which the defendant also directly conveyed to him. Dr. Semmerling went on to explain that the defendant was working with James Williams, a reportedly violent man who was the governor of the Gangster Disciples in Carbondale, Illinois. Williams reportedly put the defendant in charge of recruiting other kids into the gang, ensuring they attended meetings and paid their dues. It was reported that the defendant oversaw a hundred other children. Dr. Semmerling's mitigation report also indicated that, as a child, the defendant was taken to prison visits with prostitutes posing as his mother so that he could have meetings with high-ranking gang members, who gave him tasks and advice. The report also indicated that the defendant would communicate with Larry Hoover, the founder of the Gangster Disciples, by letter and by phone.

¶ 28 Dr. Semmerling further testified that the defendant remained a Gangster Disciple after entering prison. According to the mitigation report, three months after the defendant was transferred from Menard Correctional Center to Joliet Correctional Center on January 7, 1998, the Gangster Disciples there "made [him] a Unit Coordinator in the West House." Dr. Semmerling's report also indicated that Gangster Disciples "were impressed that [the defendant] knew his gang literature and had served time in Menard." Moreover, the report indicated that the Gangster Disciples at Joliet Correctional Center "wanted to improve their legitimacy, and they thought [the defendant] could manage the younger prisoners well." Dr. Semmerling's report also indicated that, while at Joliet Correctional Center, the defendant worked in the commissary store for seven months. According to the mitigation report, the defendant used the money he earned to purchase General Educational Development (GED) courses. At the hearing, Dr. Semmerling could not confirm that the defendant ever received his GED.

¶ 29    Dr. Semmerling's report also indicated that "[i]n early 2001, [the defendant] chose to leave the Gangster Disciples." However, the report also indicated that "[i]n 2004 [the defendant] relapsed into the Gangster Disciples," to help the members "get their education." Dr. Semmerling's report indicated that the defendant left the Gangster Disciples again in 2005 but did not renounce his membership until 2009. According to the mitigation report, despite sending his renunciation letter to the Warden at Statesville Correctional Center, the defendant was never brought in for "an official interview, which was normal procedure."

¶ 30    In 2007, two years before he sent his renunciation letter, the defendant created an organization he calls "The Fallback Movement." In Dr. Semmerling's mitigation report, the Fallback Movement is described as "an inmate-led movement aimed at combating the drug-induced gang culture that is responsible for destroying the moral fabric of communities." The purported goal of the movement is to "convince criminals, gangbangers, drug dealers, and other social deviants to withdraw from their criminal activity, to take full responsibility for their actions, and to work constructively with community leaders against violence." The mitigation report indicates that if an individual wishes to join the movement he has to (1) meet with the defendant; (2) indicate whether he is in a gang; (3) write a letter to a young person in the community who is at risk of becoming a gang member and encourage them not to join; (4) engage in something positive in prison, like education; and (5) write a letter to the prison administration indicating that he is a member of the movement and will not cause trouble. The mitigation report further indicates that the defendant collected letters he wrote and those of other inmates, about "personal experiences, cautionary tales and blunt stories of prison life," which he sent to his mother to distribute to the youth. The defendant believed at the time of the report that he "wrote almost 200 letters to the youth by himself." According to the mitigation report, the movement obtained

11

501(c)(3) status in December 2014; it is unclear from the record whether that status remains active. Moreover, the mitigation report indicates that the defendant's attempts to secure official recognition of the movement from the Department of Corrections have failed. While in prison, Dr. Semmerling's report also indicates that the defendant has obtained more than 90 certificates and was selected to participate in Professor Jennifer Lackey's Northwestern University education program.

¶ 31    While at the Jackson County Jail, the defendant considered himself to be "doing the work of a jailhouse lawyer," by showing other detainees how to look up law books, work on their defenses, understand their cases, and do paperwork for their cases. The mitigation report also indicates that the defendant "worked with their families" and encouraged detainees to file for "Payroll Protection Plan stimulus checks." According to the report, a fellow detainee, 18-year-old D'Angelo Roberston, told the defendant that his mother and uncles were Gangster Disciples who used his Social Security money for "their own addictions and needs." The defendant then called Roberston's uncles and "explained how they needed to step up and think about their nephew rather than themselves."The defendant also encouraged detainees to pool their commissary.

¶ 32    On cross-examination, Dr. Semmerling testified that he did not independently investigate many statements he included if they seemed plausible. Dr. Semmerling also stated that the defendant did not admit responsibility for the murders until around 2020, and he was unaware that the defendant's mother sought clemency based on the defendant's alleged innocence during the same period. Dr. Semmerling said this did not affect his assessment of their statements.

¶ 33    The defense next called Salvador Godinez, an expert in Illinois Department of Corrections policies and general corrections practices. Godinez testified that he would not be surprised to learn the defendant supervised over a hundred gang members, though he found the defendant's young

12

age at the time noteworthy. Godinez reviewed the defendant's disciplinary record, characterizing it as generally nonaggressive. Godinez saw no evidence of gang activity in the record but acknowledged that higher-ranking gang members frequently avoid activities that draw attention and that individuals may claim to have renounced gang membership while remaining active.

¶ 34    Kenneth Dixon, who was housed with the defendant in B-dorm for over a year, also testified. Dixon stated that while he was detained at the jail, he lost both of his parents, and that he was in a bad place, but the defendant "kept him going." Dixon also reported that the defendant talked to his ex-wife and convinced her to bring their children to the jail for a visit. According to the mitigation report submitted by Dr. Semmerling, the defendant had his mother "put $50 to $60" on Dixon's account "every two weeks." Dixon reported that there were no strings attached to the money and that he did not feel controlled or manipulated by the defendant. The mitigation report prepared by Dr. Semmerling also indicated that at one point the defendant talked to the officers at the jail and asked that the detainees be allowed to "solve disputes among themselves," and the officers "agreed" to let the defendant and Dixon "make first attempts to solve disputes." Dixon reported that both he and the defendant tried to handle disputes among themselves, such as breaking up fights between detainees, before guards arrived in the dorm.

¶ 35    After victim impact statements were read, the defendant delivered his statement in allocution, stating that his statement was not for mitigation but rather for "reconciliation and peace." The defendant then explained that he was solely responsible for the deaths of Terrance and Austin. The defendant explained that he blamed Reggie Cavett for the murders because he used Cavett to lure Terrance and Austin with marijuana to go behind the shed, where Terrance was murdered.

¶ 36    The defendant further explained that "Terrance died for no reason." The defendant said he shot Terrance because he was mad that Terrance did not "gangbang" as he did, and that Terrance showed no interest in the Gangster Disciples. The defendant further explained that on the night Terrance died, "[t]here was no struggle" or fight with Terrance. The defendant said that he "snuck out of the back of the trailer and went around and shot [Terrance] in the head," and that Terrance did not see him.

¶ 37    The defendant then described shooting Austin. He stated that he did not shoot Austin because he was trying to rob him; he already had Austin's money before he shot him. Instead, he shot Austin after killing Terrance because Austin was there when he shot Terrance, and he didn't want to go to prison. After shooting Terrance, Austin ran and had outrun the defendant, who was tired, so the defendant made him stop. The defendant said to Austin, "[s]top running, Austin. I want to talk to you," and "Austin, just stop. I only want to talk to you." When Austin stopped and turned around, he said to the defendant, "[w]hat did I do?" The defendant then "shot [Austin] in the face." The defendant explained that when Austin fell, "he made some sounds, crazy sounds" that the defendant had never heard, and that the defendant knew Austin was still alive, so he shot Austin again. The defendant went on to say that Terrance and Austin weren't his enemies, or opposition gang members; they were "innocent boys that shouldn't have been around [him]."

¶ 38    The defendant said he pursued prison programming not out of academic interest, but because he wanted peace. The defendant stated that incarceration alone does not rehabilitate individuals and expressed remorse for involving the victims' families while pursuing his freedom.

¶ 39    Before closing statements, the resentencing court noted that the defendant "elected to be sentenced under the statute in effect in the mid-nineties." The court therefore noted that it was not

14

"bound to follow 5-4.5-105" but that it found that the section on juvenile sentencing was helpful and an "entirely appropriate consideration."

¶ 40   In closing, the State argued that no mitigating factors applied. The State highlighted the seriousness of the harm, the defendant's prior delinquency, and his commission of the murders while awaiting adjudication for physically assaulting a young woman with a pool cue. The State also argued that deterrence warranted a severe sentence.

¶ 41   The State then reviewed the *Miller* factors, arguing that the defendant demonstrated maturity through his organization of a hundred gang members, his ability to schedule meetings, collect dues, and flee the jurisdiction. The State contended that the defendant understood the risks of his conduct. The State acknowledged that while the defendant was subject to outside pressure from peers, family, and negative influences, he was also the pressure for others as he coordinated the hundred or more other gang members. The State noted that after he fled the jurisdiction for these murders, he was arrested in California selling crack cocaine. In terms of the defendant's potential for rehabilitation, the State argued that the defendant lacks the tools to return to the world, noting that despite 25 years of incarceration, he had not obtained a GED. The State also addressed the circumstances and the degree of the defendant's participation as the sole shooter in the offenses. Moreover, the State pointed out that the defendant's juvenile delinquent conduct was escalating; the defendant went from gunplay and threats, to carjacking, to beating a young woman and engaging in mob action, to a double murder. The State also acknowledged that the defendant was fully able to meaningfully participate in his defense. Lastly, the State pointed out that the defendant waited until the resentencing hearing to tell the victim's families the truth. In response to the resentencing court's questions, the State argued that the defendant was permanently incorrigible, citing his conduct in prison and at the jail as evidence of deception.

15

¶ 42　In closing, the defense argued that under the defendant's elected sentencing scheme, the maximum permissible sentence was 60 years because no jury made findings necessary for an enhanced sentence. The defense argued that the defendant's youth impaired his decision-making, that he was exposed to violence and had learning difficulties, and that older gang members exploited him. The defense asserted he was a gang member but not a leader. Addressing the GED issue, counsel pointed to the defendant's many certificates, the limited programming available to individuals serving life sentences, the cost of correspondence education, and COVID-related disruptions.

¶ 43　The defense emphasized the defendant's high ACES score and Godinez's testimony that the defendant exhibited low aggression and no gang activity in prison. The defense also explained the defendant's release plans, which included relocation, obtaining a commercial driver's license, and continuing the work he has undertaken while in custody. Lastly, the defense highlighted the defendant's remorse.

¶ 44　Before issuing its sentence, the resentencing court stated that it had reviewed all materials thoroughly, including transcripts, PSI reports, and the mitigation report multiple times. The resentencing court specifically noted that it read Dr. Semmerling's report "at least four times, perhaps more." The resentencing court described the murders as "one of the worst crimes, if not the worst crime" it had ever seen, and that it was an "utterly senseless utterly gratuitous crime." The resentencing court acknowledged the harm caused to the victims' families, the defendant's family, and the community. The resentencing court emphasized its responsibility to evaluate "the person that's before the Court and evaluate the particular facts and circumstances of the case and as it relates to the person."

¶ 45    Regarding witness credibility, the resentencing court found Fought's testimony credible and helpful, and found Detective Stark's testimony helpful for context but not as substantive evidence. The resentencing court found the testimony of Morris and Brooks credible, and Sergeant Williamson's testimony credible but limited in weight due to limited contact. The resentencing court found Rodney not particularly credible, given his prior convictions and the circumstances of his testimony. The resentencing court found Dr. Garbarino's testimony helpful and highlighted that Dr. Garbarino, when asked directly, acknowledged that "there was an entrenched pattern of criminal behavior."

¶ 46    The resentencing court found portions of Dr. Semmerling's testimony helpful but was not persuaded by his methodology, noting that the mitigation report reflected unverified statements from self-selected interviewees and was "self-serving." The resentencing court found the report to be of limited utility, because Dr. Semmerling conducted little independent investigation. The resentencing court found Godinez's testimony helpful, particularly regarding the defendant's disciplinary records and their implications. The resentencing court found Dixon somewhat credible. The resentencing court also considered the victim impact statements and afforded them appropriate weight.

¶ 47    In its analysis of the statutory aggravation factors, the resentencing court found that the defendant caused serious harm and had a significant history of criminal behavior, with offenses escalating in a short period following his release from juvenile custody. Although the resentencing court acknowledged the defendant's youth, it found that he nonetheless demonstrated awareness of the consequences and that deterrence remained an important factor.

¶ 48    Addressing the *Miller* factors, the resentencing court first considered the defendant's chronological age and its hallmark features. It found that although the defendant was 17-and-a-

17

half years old at the time of the crimes, he had prior experiences with risks, firearms, and the juvenile justice system. The resentencing court explained that these murders were not the defendant's first experience with the criminal justice system; he had been to the Department of Juvenile Justice and had a pending petition for beating someone with a pool cue. The resentencing court then determined that the defendant's age was not dispositive in light of his conviction.

¶ 49   Regarding family and home environment, the resentencing court acknowledged the defendant's difficult circumstances but noted that many others face similar or worse conditions. It noted that the defendant has a very supportive family, which had written letters, advocated on his behalf, filed clemency petitions, and done many things to support him, including speaking with Dr. Semmerling at length. The resentencing court also observed that the defendant had more support than had been suggested. Thus, the resentencing court found that the family and home environment factor did not weigh in favor of a lesser sentence.

¶ 50   Concerning susceptibility to familial and peer pressures, the resentencing court recognized that for the defendant to be a member of a street gang at such a young age, he had to have some negative influences in his life, including those that got him involved with the gang. However, the resentencing court noted that by the defendant's own admission, he was not pressured or directed in any of the actions he took, or that occurred in this case. It acknowledged that the defendant was a leader of other kids in the gang and that people have some responsibility for their own actions, even as a child. The resentencing court then stated that it "reviewed the mitigation report offered by the defense multiple times," and the factor did not necessarily weigh in favor of a lesser sentence.

¶ 51   The resentencing court found that the circumstances of the offense did not favor leniency. It emphasized that the defendant acted alone, may have manipulated others into helping him or

18

facilitating the circumstances that led to the murders, and at times blamed others for the crimes. The resentencing court also considered the defendant's competency in light of his youth and found him competent and mature enough to flee the jurisdiction and engage in further criminal conduct. It further acknowledged that, based on the transcripts, the defendant was "quite capable of offering testimony and his own version of events" during the proceedings.

¶ 52    Regarding rehabilitative potential, the resentencing court concluded that although the defendant was not beyond rehabilitation and engaged in some rehabilitation over the last several years, it was unclear whether his actions were altruistic. The resentencing court found it plausible that the defendant was manipulating people and looking for young people and vulnerable people to manipulate. It could not reach a firm conclusion on whether the defendant's recent actions were altruistic, because it was not clear to the court. Thus, the resentencing court found that the defendant's rehabilitative potential was not dispositive of the ultimate sentence.

¶ 53    The resentencing court ultimately imposed a discretionary natural life sentence, citing the seriousness of the offenses, the defendant's escalating conduct, his gang involvement and supervisory role, and the nature of the crimes. In the written judgment pronouncing the defendant's sentence, the resentencing court stated that it found "that the defendant [was] convicted of a Class M offense and sentenced as a *Class M* offender pursuant to 730 ILCS 5/5-8-1(a)(1)(b) (West 1992) (by defendant's election on resentencing) on Counts I and II." (emphasis in original).

¶ 54    Following his resentencing, the defendant filed a motion asking the court to reconsider his sentence on April 27, 2023. In the motion the defendant argued that (1) he was deprived of his opportunity to elect the sentencing scheme under which he would be sentenced, (2) the court erroneously sentenced him under section 5/5-8-1(a)(1)(b) of the Code, (3) he could not be sentenced to discretionary life under the 1996 statute, (4) his sentence violates the eight

19

amendment and the proportionate penalties clause, (5) the court erred in admitting the investigative reports prepared by Detective Stark, (6) the court made improper credibility determinations, (7) the court erred in denying video testimony at the hearing, and (8) the court failed to properly consider his mitigating factors. On June 1, 2023, after receiving the State's response to the defendant's motion, the defendant's reply to the State's response, and hearing arguments on the motion, the resentencing court denied the defendant's motion to reconsider his sentence. The defendant filed a timely notice of appeal on June 12, 2023.

¶ 55                                    II. ANALYSIS

¶ 56    On appeal, the defendant raises multiple issues in challenging his sentence. He argues that (1) the resentencing court lacked the statutory authority to impose a discretionary natural life sentence; (2) he was not properly admonished of his right to elect to be sentenced under the statute in effect at the time of the offense or the law that was in effect at the time of his resentencing; (3) the resentencing court abused its discretion in imposing a discretionary natural life sentence; (4) his sentence violates the eighth amendment, because the resentencing court failed to meaningfully consider his youth and its attendant characteristics, as required by *Miller* and subsequent cases interpreting *Miller*; and (5) his natural life sentence violates the Illinois Constitution's proportionate penalties clause because the resentencing court failed to properly consider the relevant characteristics that accompanied his youth at the time of the offenses and failed to sentence him with the goal of rehabilitation.

¶ 57        A. The Statutory Authority for the Defendant's Natural Life Sentence.

¶ 58    The defendant argues that none of the 1996 sentencing provisions authorizing a mandatory or discretionary natural life sentence applied to him. The defendant further argues that section 5-8-1(a)(1)(c)(ii) of the Code, mandating a natural life sentence for a defendant who kills more than

one victim, was made inapplicable to juvenile defendants by *Miller*. Similarly, the defendant contends that he could not be sentenced to a discretionary natural life sentence pursuant to section 5-8-1(a)(1)(b) of the Code based on a finding that the murder was accompanied by exceptionally brutal behavior indicative of wanton cruelty because the court never explicitly made that finding.

¶ 59    In response, the State argues that this court's reasoning in *People v. Gibbs*, 2022 IL App (5th) 200096-U, is controlling. We agree. In *Gibbs*, the defendant, who was then 17 years old, shot and killed his parents. *Id.* ¶ 6. In 1995, the defendant pled guilty and was sentenced to natural life under the then-applicable version of section 5-8-1(a)(1)(c)(ii) of the Code (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1992)), mandating a natural life sentence for a defendant who kills more than one victim. *Gibbs*, 2022 IL App (5th) 200096-U, ¶ 21. Similarly, after a postconviction *Miller* challenge, the defendant was resentenced and received a natural life sentence. *Id.* ¶ 58. On appeal, the defendant similarly argued that the 1992 statutes, post-*Miller*, did not authorize his natural life sentences. *Id.* ¶ 71. However, this court affirmed the defendant's discretionary life sentence. *Id.* ¶ 77.

¶ 60    In reply, the defendant argues that the State's reliance on *Gibbs* is misplaced because "*Gibbs* is a federal, not state, constitutional case, so is legally distinguishable." Further, the defendant contends that the cases are factually dissimilar because the defendant in *Gibbs* was based on "objective testimony showing that many of the hallmarks of youth, such as an abusive home or impetuosity, were not evident in the defendant's childhood," and that while incarcerated, he had shown minimal rehabilitative efforts. Whereas from the defendant's view, he presented evidence that the factors were present and he demonstrated extensive rehabilitation, and the resentencing court "just minimized them."

¶ 61    We first consider whether the resentencing court had the statutory authority to sentence the defendant to natural life in prison. Whether a defendant's sentence is authorized by statute presents a question of law, reviewed *de novo*. *People v. Cisco*, 2019 IL App (4th) 160515, ¶ 23 (citing *People v. Smith*, 345 Ill. App. 3d 179, 189 (2004)).

¶ 62    Section 5-8-1(a)(1)(c)(ii), under which the defendant was sentenced, mandates a term of natural life for persons 17 years or older who are found guilty of murdering more than one victim. In pertinent part, section 5-8-1(a)(1)(c)(ii) states:

"(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder,

* * *

(c) the court shall sentence the defendant to a term of natural life imprisonment when the death penalty is not imposed if the defendant,

* * *

(ii) is a person who, at the time of the commission of the murder, had attained the age of 17 or more and is found guilty of murdering an individual under 12 years of age; or, irrespective of the defendant's age at the time of the commission of the offense, is found guilty of murdering more than one victim[.]" 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996).

¶ 63    Before discussing the defendant's specific contentions, the defendant expressed his desire to be sentenced under the laws in effect in 1996, when he committed the offenses. A sentence of

22

natural life in prison was mandatory under the applicable statute for defendants convicted of murdering more than one individual. *Id.* A discretionary sentence of natural life was also authorized if the court found that the murder was accompanied by brutal and heinous conduct indicative of wanton cruelty or if any of the aggravating factors for imposition of the death penalty were present. *Id.* § 5-8-1(a)(1)(b). Those factors included a conviction for murdering multiple victims (720 ILCS 5/9-1(b)(3) (West 1996)) or a finding that the murder was "committed in a cold, calculated and premeditated manner pursuant to a preconceived plan" (*id.* § 9-1(b)(11)).

¶ 64    We now consider the defendant's argument that *Miller* made section 5-8-1(a)(1)(c)(ii) of the Code, mandating natural life in prison for defendants convicted of multiple murders, inapplicable to him because he was a juvenile when he killed Terrance and Austin. As we explained in *Gibbs*, the *Miller* Court discussed at length the need for sentencing courts to be able to consider the mitigating characteristics of youth before sentencing a juvenile murder defendant to natural life in prison without the possibility of parole. See *Miller*, 567 U.S. at 473-79, 489. As we further explained in *Gibbs*, in *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), the Court held that *Miller* announced a substantive rule of constitutional law that must be applied retroactively. *Montgomery*, 577 U.S. 190, 212 (2016). In *Montgomery*, the Court further held that converting a life sentence without the possibility of parole to a life sentence with the possibility of parole was sufficient to remedy a *Miller* violation retroactively. *Id.*

¶ 65    Illinois courts generally require a remand for resentencing. See, *e.g.*, *People v. Buffer*, 2019 IL 122327, ¶ 49; *People v. Davis*, 2014 IL 115595, ¶ 43. However, the *Montgomery* Court's holding—which allows juveniles to remain sentenced under statutes like the one at issue here— indicates the constitutional flaw lies not with application of the underlying sentencing statutes, but rather, with their mandatory effect. See *Davis*, 2014 IL 115595, ¶ 43 (emphasizing that "*Miller*

23

does not invalidate the penalty of natural life without parole for multiple murders, only its *mandatory* imposition on juveniles" (emphasis in original)). For these reasons, we find similarly as we found in *Gibbs*, section 5-8-1(a)(1)(c)(ii) of the Code provided statutory authority for the defendant's natural life sentence even though its application to him could not be mandatory.

¶ 66    We next consider the defendant's contention that he could not be sentenced to a discretionary sentence of natural life in prison pursuant to section 5-8-1(a)(1)(b) of the Code. We note that neither the jury nor the trial court made an express finding that the murders were accompanied by exceptionally brutal behavior indicative of wanton cruelty. The defendant argues that this court should remand his case for sentencing because the resentencing court's allegedly erroneous written sentencing judgment stated that it imposed a sentence under his elected sentencing scheme "730 ILCS 5/5-8-1(a)(1)(b) (West 1992)," which he did not elect to be sentenced under.

¶ 67    In response, the State argues that when there is a conflict between the resentencing court's oral sentencing judgment and the written sentencing judgment, the oral record controls. The State further argues that even if the oral record did not clearly establish which statute the defendant was being sentenced under, the resentencing court's September 2, 2021, order stating the applicable sentencing range confirms the resentencing court's intent to sentence the defendant pursuant to section 5-8-1(a)(1)(c)(ii) of the Code (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)). We agree.

¶ 68    Had the jury been presented with the proposition that the murders were "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty," during the original trial, then the resentencing court would have had the discretion to sentence the defendant to natural life. *Id.* § 5-8-1(a)(1)(b). However, the proposition was never presented to or determined by the jury in this case; and as established in *Apprendi*, any fact that increases a defendant's sentence beyond the

24

ordinary statutory maximum, such as a determination that the offense was brutal or heinous and demonstrated wanton cruelty, must be submitted to a jury and proven beyond a reasonable doubt. *People v. Swift*, 202 Ill. 2d 378, 384, 392 (2002).

¶ 69    It is well settled that "[w]hen the oral pronouncement of the court and the written order conflict, the oral pronouncement of the court controls." *People v. Roberson*, 401 Ill. App. 3d 758, 774 (2010) (citing *People v. Smith*, 242 Ill. App. 3d 399, 402 (1993)). With this in mind, the question of whether the offense was brutal or heinous and demonstrated wanton cruelty was not posited to the jury, and the court did not expressly find that the murders were accompanied by exceptionally brutal conduct indicative of wanton cruelty. Through examining the record, it is clear that it was not the intent of the resentencing court to sentence the defendant pursuant to section 5-8-1(a)(1)(b) of the Code.

¶ 70    On September 2, 2021, after multiple amendments to memorandums, responses to the memorandums, and oral argument on the issue of the applicable sentencing range, the resentencing court filed an order stating its determination of the applicable sentencing range. The order stated in part "[i]n the alternative, the Court may, in its discretion, and only after considering the Defendant's youth and attendant characteristics, sentence the Defendant to Natural Life Imprisonment in the Illinois Department of Corrections, pursuant to Section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections." Nowhere in the order did the resentencing court cite to section 5-8-1(a)(1)(b) of the Code, nor did it mention the ability to sentence the defendant to life after a finding that the offense was brutal or heinous and demonstrated wanton cruelty.

¶ 71    After the resentencing court issued its written order determining the applicable sentencing range, defense counsel sought to readdress the issue in amended and supplemental sentencing memoranda. The resentencing court remained unpersuaded; it maintained that the sentencing range

that it had laid out in its order was consistent with current case law. On March 28, 2023, the first day of the resentencing hearing, defense counsel again tried to address the issue of the applicable sentencing range, and the resentencing court maintained that the sentencing range that it had laid out in its order, where it found discretionary life was available under section 5-8-1(a)(1)(c)(ii) of the Code and was consistent with current case law. The resentencing court did not mention the ability to sentence the defendant to life after a finding that the offense was brutal or heinous and demonstrated wanton cruelty.

¶ 72 On April 27, 2023, after the resentencing court issued its written judgment sentencing the defendant to discretionary life, defense counsel brought this error to the resentencing court's attention, stating that "[t]he Court's order erroneously [stated] that [the defendant] elected to be sentenced under 730 ILCS 5/5-8-1(a)(1)(b)." On June 1, 2023, at the posttrial hearing on the defendant's motion to reconsider his sentence, defense counsel again brought the error to the resentencing court's attention, stating that the "judgment reflected the wrong election. It said that [the defendant] elected to be sentenced under 730 ILCS 5/5-8-1(a)(1)(b)." The resentencing court then asked if it had misstated that at the sentencing hearing, to which defense counsel replied: "I believe it was only in the judgment." During rebuttal, defense counsel again stated that the defendant's election was not honored. The resentencing court explained that it had already addressed the appropriate sentencing scheme in its written order and that, although the defendant continued to disagree with the court's interpretation, the court maintained that discretionary life was available. Accordingly, we find that, based on the record, the resentencing court applied section 5-8-1(a)(1)(c)(ii) of the Code, and not section 5-8-1(a)(1)(b), and the error in the written judgment was a scrivener's error.

¶ 73                              B. The Defendant's Right to Elect.

¶ 74     We next consider whether the resentencing court failed to admonish the defendant of his right to elect to be sentenced under the law at the time of the murders or under the law in effect at the time of his resentencing. Additionally, we consider whether the resentencing court failed to honor the defendant's election to the 1996 statute.

¶ 75     A defendant has the right to be sentenced under either the law in effect at the time the offense was committed or the law in effect at the time of sentencing. *People v. Horrell*, 235 Ill. 2d 235, 242 (2009); *People v. Hollins*, 51 Ill. 2d 68, 71 (1972); *People v. Strebin*, 209 Ill. App. 3d 1078, 1081 (1991); See 5 ILCS 70/4 (West 2022) ("If any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect."). Our supreme court has placed an affirmative duty on the trial court to advise a defendant of the right to elect the provision under which he or she should be sentenced, noting, in the absence of a showing that a defendant was advised of that right of election and an express waiver of that right, the defendant is denied due process of law. *Hollins*, 51 Ill. 2d at 71. Our supreme court has also indicated that *Hollins* should be limited to its facts and that a failure to advise a defendant of their right to make a sentencing election does not automatically constitute a constitutional violation. *People v. Gonzalez*, 56 Ill. 2d 453, 457(1974). "Whether defendant was denied his right to elect involves the application of law to uncontested facts and is reviewed *de novo*." *People v. Vlahon*, 2012 IL App (4th) 110229, ¶ 16.

¶ 76     The defendant acknowledges that his defense counsel reported to the resentencing court that he wished to be sentenced under the 1996 law that was in effect at the time of the murders, but he claims he did not understand his right to choose the more recent law. The defendant also

asserts that if this court finds that he was admonished of his right to elect, the resentencing court failed to honor his election to be sentenced under the 1996 statute in effect at the time of the murders (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)), when the court in its written judgment cited that the defendant was being sentenced under "730 ILCS 5/5-8-1(a)(1)(b)."

¶ 77    In response, the State argues that the defendant was aware of his right to elect the statute under which he would be sentenced and that he exercised that right when he elected to be sentenced under the 1996 statute. In reply, the defendant maintains that he did not exercise his right to elect the sentencing statute under which he wished to be sentenced because the resentencing court failed to admonish him of that right; instead, the court chose which law to apply.

¶ 78    The defendant's principal reliance here is placed on our supreme court's decision in *Hollins*. *Hollins* held that the failure to inform the defendant of his right to elect which statute he should be sentenced under, when coupled with the absence of an express waiver of that right, constituted a denial of due process. *Hollins*, 51 Ill. 2d at 71. The court has also explained that *Hollins* "must be read in the light of its factual setting." *Gonzalez*, 56 Ill. 2d at 455.

¶ 79    In *Hollins*, at the time the 16-year-old defendant committed the crime of burglary, there was a minimum statutory limit for the offense. *Hollins*, 51 Ill. 2d at 69. Nineteen days after the defendant committed the burglary, and before sentencing, an amendment to the statute became effective, removing the mandatory minimum and expanding the maximum sentence to natural life. *Id.* at 71. Because of this difference in the sentencing range, the defendant was entitled to be sentenced under either the law in effect at the time the offense was committed, or that was in effect at the time of sentencing. *Id.* Because the record failed to show that the defendant was "advised of his right to, or permitted to," make the choice of which sentencing scheme to be sentenced under,

nor did it show that he waived that right, his sentence was vacated, and his cause was remanded. *Id.* 71-72.

¶ 80    Here, there are substantial differences between this defendant and the one in *Hollins*. Most notably, in this case, the defendant was aware of his right to elect and that he could either elect to the 1996 sentencing scheme in effect at the time of the murders or the 2023 sentencing scheme at the time of his resentencing. This is evident due to the fact that, before the defendant's resentencing, the resentencing court received multiple motions and memoranda in which counsel stated that the defendant elected to be sentenced under the 1996 statute, indicating that he understood his right to elect.

¶ 81    The resentencing court first received notice that the defendant was electing to be sentenced under the 1996 statute on April 23, 2021, 1 year and 11 months before the defendant's resentencing hearing. In the "DEFENSE MEMORANDUM AS TO SENTENCING RANGE PURSUANT TO *MILLER* AND ITS PROGENY," defense counsel acknowledged the defendant's right to elect and stated "Labron Neal *elects* to be sentenced pursuant to the 1996 law." (Emphasis added).

¶ 82    On July 9, 2021, 1 year and 8 months before the defendant's resentencing hearing, the resentencing court again received notice that the defendant was electing to be sentenced under the 1996 statute when in "DEFENDANT'S FIRST AMENDED MEMORANDUM AS TO SENTENCING RANGE," defense counsel stated "Labron Neal *elects* to be sentenced pursuant to the 1996 law." (Emphasis added).

¶ 83    On September 27, 2021, 1 year and 6 months before the defendant's resentencing hearing, the resentencing court again received notice that the defendant was electing to be sentenced under the 1996 statute. In the "DEFENDANT'S MOTION TO RECONSIDER ORDER AS TO SENTENCING RANGE," where the defendant asked the resentencing court to reconsider its

29

determination that the defendant was eligible for discretionary life under the 1996 statute, defense counsel stated that the defendant "has *elected* to proceed under the law that existed *at the time of the offense* in this case (1996)." (Emphases added).

¶ 84    On October 18, 2022, 5 months before the defendant's resentencing hearing, the resentencing court again received notice that the defendant was electing to be sentenced under the 1996 statute when, in "DEFENDANT'S SECOND AMENDED SENTENCING MEMORANDUM," defense counsel stated that the defendant "would like to be sentenced based on the statute as it stood in 1996." On October 18, 2022, the defendant also filed a "MOTION TO AMEND MOTION TO RECONSIDER," wherein the resentencing court again received notice that the defendant was electing to be sentenced under the 1996 statute. In the motion, defense counsel stated in the introduction: "Mr. Neal would like to be sentenced under the law in 1996, *which is when the shooting occurred*." Defense counsel also included, in the motion, a subsection titled: "Mr. Neal *Elects* to be Sentenced Under the Statutes in Effect in August 1996," in which counsel stated "Mr. Neal *elects* to be sentenced under the sentencing regime applicable *at the time of the offense* in August 1996." (Emphases added).

¶ 85    Even after the defendant was sentenced to discretionary life, he maintained that he had elected to be sentenced under the 1996 statute. On April 27, 2023, in the defendant's "MOTION TO RECONSIDER SENTENCE," defense counsel stated: "In both written and oral motion[s], Mr. Neal communicated that he *elected* to be sentenced under the 1996 statute." (Emphasis added). In the motion, defense counsel also stated in its argument that: "Because Mr. Neal *chose to be sentenced under the sentencing scheme in place at the time of the offense* in 1996, the only available sentencing range is 20-60 years under 730 ILCS 5/5-8-1(a)(1)(a) (1996)." (Emphasis added).

¶ 86    Looking to the resentencing court transcripts, it is also clear that the defendant was aware of his right to elect and that he could either elect to the 1996 sentencing scheme in effect at the time of the murders or the 2023 sentencing scheme at the time of his resentencing. On March 28, 2023, the first day of the resentencing hearing, defense counsel stated: "Mr. Neal has made clear and continues to make clear *that he chooses to be sentenced under the law in effect in 1996 and not the law today*." (Emphasis added). The resentencing court also acknowledged the defendant's election, noting before closing arguments on the fourth day of the resentencing hearing that the "defendant has elected to be sentenced under the statute in effect in the mid-nineties." During the defense counsel's closing argument, counsel further stated that the defendant has a right to elect and that the defendant has "chosen to be sentenced under that 1996 scheme." Moreover, during the hearing on the defendant's motion to reconsider on June 1, 2023, defense counsel acknowledged that the defendant elected to be sentenced under the 1996 statute (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)), when defense counsel argued that "Mr. Neal cannot be sentenced to discretionary natural life under the law in place in 1996, which is what he *elected*." (Emphasis added).

¶ 87    Thus, similarly to our supreme court's decision in *Gonzalez*, we find that the absence of an explanation to the defendant of his right to elect to be sentenced under either the 1996 sentencing scheme in effect at the time of the murders or the 2023 sentencing scheme at the time of his resentencing does not, under the specific facts and circumstances of this case, constitute a denial of due process rights. See, *Gonzalez*, 56 Ill. 2d 453 (1974). We also find that the resentencing court honored the defendant's election to be sentenced under the 1996 statute that was in effect at the time of the murders, because as stated above, based on the record, the resentencing court applied

31

section 5-8-1(a)(1)(c)(ii) of the Code, and not section 5-8-1(a)(1)(b), and the error in the written judgment was a scrivener's error.

¶ 88                                    C. The Resentencing Court's Discretion.

¶ 89    We next consider whether the resentencing court abused its discretion in sentencing the defendant to natural life. It is well settled that the sentencing court has broad discretion when imposing a sentence. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). The circuit court is granted such discretion in sentencing because "the trial court is in a better position to judge the credibility of the witnesses and the weight of the evidence at the sentencing hearing." *People v. Ramos*, 353 Ill. App. 3d 133, 137 (2004). If a sentence falls within the appropriate statutory range, it will not be disturbed upon review, absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). An abuse of discretion occurs when a sentence varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Alexander*, 239 Ill. 2d at 212.

¶ 90    A sentence should reflect both the seriousness of the offense and the objective of restoring the defendant to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Foxx*, 2018 IL App (1st) 162345, ¶ 50. This constitutional mandate calls for the balancing of the retributive and rehabilitative purposes of punishment, and this process requires careful consideration of all aggravating and mitigating factors. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The most important consideration at sentencing is the seriousness of the offense, not the presence of mitigating factors. *Foxx*, 2018 IL App (1st) 162345, ¶ 50.

¶ 91    We presume that the trial court considered all relevant factors and any mitigation evidence presented. *Id*. The circuit court is not, however, obligated to recite or assign any value to each factor. *Id.* Instead, the defendant is required to make an affirmative showing that the court did not

32

consider the relevant factors. *Id.* In reviewing a sentence for an abuse of discretion, the reviewing court must not substitute its judgment for that of the circuit court merely because the reviewing court would have weighed the various factors differently. *Alexander*, 239 Ill. 2d at 213.

¶ 92    For sentencing purposes, juveniles are considered constitutionally different from adults. *Miller*, 567 U.S. at 471. A sentence for a juvenile offender is unconstitutional where "(1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *People v. Buffer*, 2019 IL 122327, ¶ 27. The resentencing court, however, is not prohibited from sentencing a juvenile to a natural life sentence, but the court must first consider " 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' " *Montgomery*, 577 U.S. 208 (quoting *Miller*, 567 U.S. at 480). *Miller* requires that a sentencer must consider certain factors relevant to a juvenile's youth and its attendant characteristics before imposing a sentence of life imprisonment without parole. *Miller*, 567 U.S. at 469-70. Those factors include, but are not limited to the juvenile defendant's (1) chronological age at the time of the offense and any evidence of his particular immaturity; impetuosity, or failure to appreciate risks and consequences; (2) family and home environment; (3) degree of participation in the criminal conduct and any evidence of familial or peer pressure that may have affected him; (4) incompetence, including his ability to deal with police officers or prosecutor and his incapacity to assist his own attorneys; and (5) prospects for rehabilitation. *Id.* 477-78.

¶ 93    Illinois has since codified the *Miller* factors into state statutory law. See 730 ILCS 5/5-4.5-105(a) (West 2022). As such, before sentencing a juvenile defendant, a sentencing court must consider the following factors in mitigation:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.*

¶ 94   In reviewing a sentence, the primary consideration is the evidence of the defendant's youth and its attendant characteristics at the time of sentencing. *People v. Lusby*, 2020 IL 124046, ¶ 35. Moreover, "[n]o single factor is dispositive." *Id.* Rather, on appeal we review the proceedings to ensure that the resentencing court "made an informed decision based on the totality of the circumstances." *Id.*

¶ 95   The defendant asserts that the resentencing court did not properly consider his mitigating factors and instead "focused almost exclusively on the nature of the crime." The defendant also contends that the resentencing court's credibility findings were arbitrary and contradictory to the evidence. In response, the State argues that the resentencing court considered all relevant factors, including mitigation, and did not abuse its discretion in assessing credibility. In reply, the

defendant maintains that the resentencing court's sentencing decision and credibility determinations were arbitrarily based on its own personal beliefs. We disagree.

¶ 96    Our review of the record shows that the resentencing court appropriately and thoroughly addressed all nine factors in section 5-4.5-105(a) of the Code (*id.*), as well as those set forth in *Miller*. Moreover, the record makes clear that the resentencing court carefully considered the defendant's sentence after reviewing all evidence submitted by the parties. Nonetheless, the defendant contends that some factors were improperly considered.

¶ 97    We first reject the defendant's arguments that the resentencing court did not consider the mitigating aspects of his age and immaturity, as this argument is directly rebutted by the record. In its oral ruling, the resentencing court acknowledged that the defendant was a juvenile at the time of the offense. Even so, the resentencing court did not find that factor particularly mitigating. During sentencing, the resentencing court acknowledged that the defendant was 17-and-a-half years old and that he "was a person who had experience with risks and consequences during his adolescence." The resentencing court also acknowledged Dr. Garbarino's testimony regarding the defendant's youth and maturity. The resentencing court recounted that the defendant's experiences with risks and consequences were explained by the defendant's own statements, testimony that the court had heard, and what the court had read in the extensive court file. The resentencing court also noted that this offense was not the defendant's first experience with a gun or the criminal justice system; he had been to the Department of Juvenile Justice, and he had a pending petition for beating someone with a pool cue at the time of the murders. In any case, as the resentencing court specifically stated during sentencing that it had reviewed Dr. Semmerling's mitigation report "at least four times," which contained information related to the defendant's youth and maturity, we presume the resentencing court considered it. See *People v. Sauseda*, 2016 IL App (1st)

35

140134, ¶ 19 (absent indication to the contrary, it is presumed the court considered the mitigating evidence presented). Accordingly, the record demonstrates that the court considered the testimony of Dr. Garbarino, the defendant's age, immaturity, and prior experiences, but ultimately found that those considerations did not outweigh the aggravating circumstances. As we previously noted, the reviewing court must not substitute its judgment for that of the circuit court merely because it would have weighed the various factors differently. *Alexander*, 239 Ill. 2d at 213.

¶ 98 Next, similar to the defendant's argument in the previous section, he asserts that the resentencing court "unreasonably minimized the hardships he suffered as a child." In its oral ruling, the resentencing court acknowledged that the defendant "faced some very difficult circumstances growing up." The resentencing court noted some societal circumstances in Carbondale, such as drugs, gangs, and guns. However, the resentencing court noted that the defendant "has a very supportive family" who have done much to support him, including speaking with Dr. Semmerling to prepare the mitigation report, writing letters, and filing clemency petitions on his behalf. The resentencing court also considered the defendant's exposure to gangs. The resentencing court expressly acknowledged that there were "older men in the community that preyed on [the defendant] and got him involved in a street gang." However, once involved, the resentencing court explained, the defendant became a leader of other kids. Again, as the resentencing court specifically stated at sentencing, it had reviewed Dr. Semmerling's mitigation report, which contained information regarding the defendant's outside pressure, home environment, and educational and social background. We do not find any error in the resentencing court's consideration of this factor.

¶ 99 Next, the defendant similarly argues that while he was the sole perpetrator of the crimes, he was in a dark place, and the nature of the crime does not determine whether he can be redeemed.

36

However, "[t]he gravity of the offense and surrounding circumstances are primary matters" for the court to consider when fashioning an appropriate sentence. *People v. Andrews*, 210 Ill. App. 3d 474, 483 (1991). Here, in its oral ruling, the resentencing court determined that the circumstances of the offense did not favor leniency. The resentencing court acknowledged that the defendant acted alone, may have manipulated others into helping him or facilitating the circumstances that led to the murders, and at times blamed others for the crimes. During the defendant's statement in allocution, he admitted to coercing Cavett to "lure" Terrance and Austin behind the shed before they were murdered. Accordingly, we do not find any error in the resentencing court's consideration of the circumstances surrounding the murders.

¶ 100　　The defendant also argues that the resentencing court rejected the idea that he was not able to meaningfully participate in his defense because he was able to testify at trial. We disagree. When the defendant first appeared before the trial court on November 16, 1996, the trial court appointed the public defender's office to represent him. Throughout both trials, the defendant was represented by counsel and testified in his own defense. The defendant highlights that he fled the jurisdiction and engaged in other criminal activity, including selling drugs, to demonstrate that his actions at the time were counterproductive to his own defense. However, as the State pointed out, fleeing is not unique to juveniles. Moreover, nothing in the record indicates that he was unable to fully participate in his defense. The resentencing court expressly acknowledged that the defendant "seemed quite capable of offering testimony and his own version of events." Thus, we do not find any error in the resentencing court's consideration of this factor.

¶ 101　　Additionally, the defendant argues that the resentencing court's findings contradict the evidence that rehabilitation is possible. In its oral ruling, the resentencing court acknowledged that no person is beyond rehabilitation and that the defendant has participated in "some rehabilitation

over the years." During the hearing, the resentencing court was presented with evidence of the defendant's positive record while incarcerated, including his creation of the "Fallback Movement". However, the fact that such evidence was presented does not, alone, support a conclusion that the resentencing court failed to consider the defendant's rehabilitative potential. Because the resentencing court was also presented with evidence suggesting the defendant may have continued, while in prison, to look for vulnerable people to manipulate for his benefit. The resentencing court noted that while it's possible the defendant "may be a very altruistic person" and chose to take people under his wing, provide them with commissary, and help them get out of gangs, out of the goodness of his heart, it may have also been "to try to improve his standing."

¶ 102   We also consider *People v. Hill*, 2022 IL App (1st) 171739-B, which was relied on by the defendant. In *Hill*, the defendant was found guilty of two counts of first degree murder and one count of attempted first degree murder, offenses he committed at the age of 15. *Id*. ¶ 1. The defendant was originally sentenced to mandatory life in prison to run consecutively to a 30-year prison term for attempted murder. *Id.* Following a successful postconviction, a resentencing hearing was held. *Id.* ¶ 12. At the hearing, the defendant presented testimony that the defendant was a "model inmate" and maintained multiple jobs in prison. *Id.* ¶ 19. The testimony also included a clinical psychologist who stated that the defendant had many traumatic experiences as a child, did not have a prior criminal history, had no serious infractions during incarceration, and had support from family members for assimilation back into the community. *Id.* ¶¶ 12-18. The resentencing court resentenced the defendant to 54 years' imprisonment, noting that a reduction was warranted, but the sentence still needed to be "a significant sentence" due to the defendant's role as one of the shooters. *Id.* ¶ 20. On appeal, the First District found, in part, that the resentencing court did not adequately consider the evidence of the defendant's rehabilitation. *Id.* ¶¶ 45-49.

¶ 103   However, the case at bar is distinguishable from *Hill*. In the instant case, the defendant was 17-and-a-half years old at the time of the murders and was the sole perpetrator. In this case, unlike in *Hill*, the resentencing court was also presented with evidence suggesting that the defendant may still have been affiliated with the Gangster Disciples and continued to seek out vulnerable people to manipulate for his benefit. We find these distinctions significant enough to distinguish *Hill* from the defendant's case. Thus, based on this record, we do not find any error in the resentencing court's consideration of this factor.

¶ 104   We also reject the defendant's argument that the resentencing court abused its discretion in making witness credibility determinations. When mitigating evidence which includes the testimony of witnesses is presented at sentencing, "it is presumed that the court considered it, unless there is some indication to the contrary." (Internal quotation marks omitted.) *People v. Lopez*, 2019 IL App (3d) 170798, ¶ 25. Here, the defendant points to nothing in the record that demonstrates that the resentencing court did not consider the mitigating testimony presented by his witnesses. Rather, the record demonstrates that the resentencing court chose to explain its credibility determinations for each of the 10 witnesses who testified at the resentencing hearing, even though it was not required to do so. This clearly indicates, on the record, that the resentencing court considered the evidence presented and the testimony of each witness. The resentencing court determined their credibility and the extent to which it considered their testimony when determining the defendant's sentence. Although the defendant characterizes the circuit court's credibility findings as arbitrary, the record reflects that the court identified specific reasons for discounting portions of the mitigation evidence regarding the weight it would afford to the testimony. Accordingly, the fact that the resentencing court assigned greater weight to the seriousness of the offenses, the defendant's escalating criminal conduct, and concerns regarding the credibility and

significance of portions of the mitigation evidence does not establish an abuse of discretion. As such, we conclude that the trial court did not abuse its discretion in sentencing the defendant to life without the possibility of parole.

¶ 105                                    D. The Eighth Amendment.

¶ 106   We next consider whether the defendant's discretionary natural life sentence violates the eighth amendment under *Miller* and its associated cases. We note that the defendant's eighth amendment claim substantially overlaps with his abuse of discretion argument. To the extent the defendant argues that the resentencing court failed to consider his youth and its attendant characteristics, the record demonstrates otherwise. The question under *Miller* is not whether the court assigned the weight defendant desired to those factors, but whether the court considered them before imposing a discretionary life sentence.

¶ 107   An as-applied constitutional challenge is a legal question that we review *de novo*. *People v. House*, 2021 IL 125124, ¶ 18. The eighth amendment prohibits cruel and unusual punishment and, under *Miller*, 567 U.S. at 479, forbids mandatory life-without-parole sentences for juvenile offenders, requiring that sentencing courts consider the mitigating qualities of youth before imposing the harshest penalties. The Supreme Court subsequently clarified that discretionary sentencing schemes satisfy this requirement so long as the sentencer considers an offender's youth and attendant circumstances before imposing a life-without-parole sentence. *Jones v. Mississippi*, 593 U.S. 98, 106 (2021).

¶ 108   The defendant argues that his natural life sentence violates the eighth amendment under *Miller* and that the resentencing court imposed it without meaningfully considering the *Miller* factors. The State responds, arguing that the defendant's sentence complies with the eighth amendment because the resentencing court considered all the *Miller* factors before sentencing him

to life without parole. In reply, the defendant maintains that the resentencing court sentenced him without meaningfully considering the *Miller* factors. For the following reasons, we agree with the State.

¶ 109   To support his argument, the defendant cites *State v. Kelliher*, 381 N.C. 558 (2022), in support of his contention that the resentencing court focused on the nature of his crimes "to the exclusion of his rehabilitative potential." In *Kelliher*, the Supreme Court of North Carolina resolved an issue where a sentencing court sentenced a juvenile offender to a *de facto* life sentence after making an express finding that the offender was "neither incorrigible nor irredeemable." *Id.* ¶ 2. The North Carolina Supreme Court determined that United States Supreme Court precedent on juvenile sentencing has set forth an eighth amendment rule that "categorically prohibits a sentencing court from sentencing any juvenile to life without parole if the sentencing court has found the juvenile to be 'neither incorrigible nor irredeemable.' " *Id.* ¶ 38. However, as the State argues, *Kelliher* is not controlling on this court, because the resentencing court here did not find that the defendant was "neither incorrigible nor irredeemable." "Decisions by courts from other states are not binding on courts of this state." *Sadler v. Creekmur*, 354 Ill. App. 3d 1029, 1037 (2004).

¶ 110   The defendant also cites *People v. McKinley*, 2020 IL App (1st) 191907, to support his argument; however, it is also distinguishable. In *McKinley*, the First District found in part that the resentencing court failed to consider relevant mitigating factors, including peer pressure, which the resentencing court explicitly deemed "irrelevant" even though the defendant had been "specifically instructed [by his peer] to shoot the victim." *Id.* ¶¶ 87-90. Moreover, the First District also found that the resentencing court explicitly disregarded the extent of the defendant's rehabilitation and did not give it adequate weight, when it gave "brief, general references to

defendant's rehabilitation." *Id.* ¶ 78. This case differs; here, the resentencing court did not fail to consider the mitigating evidence presented by the defense. The resentencing court in this case reviewed all exhibits and evidence introduced at the resentencing, including transcripts, PSI reports, and the mitigation report, multiple times and made determinations as to the weight it would give what was presented. The resentencing court in this case also walked through each of the *Miller* factors, including the defendant's potential for rehabilitation, before deciding on a sentence.

¶ 111    The defendant further cites *People v. Morris*, 2017 IL App (1st) 141117, to argue that the resentencing court gave undue weight to the nature of his crime. However, we do not find that case persuasive in this context. In *Morris*, the First District found that although the trial court commented on the defendant's youth and upbringing, it appeared to give great weight to his prior bad conduct. *Id.* ¶ 32. The First District found that it was "not apparent from the record that the trial court carefully considered defendant's youthful characteristics against those aggravating factors" before sentencing him. *Id.* However, in *Morris*, the First District rendered its decision prior to the U.S. Supreme Court's decision in *Jones*, which the First District acknowledged in *People v. Lee*, 2023 IL App (1st) 221565-U. In *Lee*, the court explained that *Morris* was unpersuasive because the primary concern in the case was "whether the trial court properly found the defendant permanently incorrigible because the appellate court believed such a finding was required for his sentence to comply with *Miller* and *Montgomery*." *Id.* ¶ 40. For this reason, we also find *Morris* unpersuasive to our analysis.

¶ 112    As stated earlier in this opinion, we find that the trial court properly considered the *Miller* factors, including the defendant's rehabilitative potential, and his youth and related characteristics. As the resentencing court explained before it went through every factor on the record, it reviewed all exhibits and evidence introduced at the resentencing, including transcripts, PSI reports, and the

42

mitigation report, multiple times. Having considered the record on appeal, we are unable to conclude that the resentencing court's sentence violated the defendant's eighth amendment constitutional rights. The record amply supports the resentencing court's consideration of the defendant's youth and its attendant characteristics at the time of sentencing. *Lusby*, 2020 IL 124046, ¶ 35. As stated earlier in this opinion, "[n]o single factor is dispositive." *Id.* Having reviewed the record, we find that the trial court's sentence was appropriately considered.

¶ 113                        E. The Proportionate Penalties Clause.

¶ 114   Last, we consider whether the defendant's life without parole sentence violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) due to the defendant's youth and attendant circumstances.

¶ 115   The proportionate penalties clause found in article I, section 11, of the Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." *ld*. The purpose of the proportionate penalties clause is to place greater restrictions on criminal sentencing than the eighth amendment's prohibition. *People v. Clemons*, 2012 IL 107821, ¶ 39. "[A]s our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community" underlying both the proportionality clause and the eighth amendment. *People v. Miller*, 202 Ill. 2d 328, 339 (2002). There are "three distinct ways in which such a challenge may be asserted": (1) a penalty that "is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community," (2) where similar offenses are considered and the less serious conduct has a more severe punishment, and (3) for offenses containing identical elements but different sentences. (Internal quotation marks omitted.) *Id.* A sentence of "any length" can violate the clause. *People v. Hilliard*, 2023 IL 128186, ¶ 29.

¶ 116   In this case, the defendant asserts that his natural life sentence is for crimes he committed when he was under the age of 18 and shocks the community's moral sense due to his age and its attendant circumstances at the time of the murders. The defendant also argues that the resentencing court failed to sentence him with the goal of restoring him to a useful citizen. In response, the State argues that the defendant waived the argument by "affirmatively electing to be sentenced under the statutory scheme in place at the time of the crime." Alternatively, the State argues that the defendant's sentence is not disproportionate and does not violate the proportionate penalties clause.

¶ 117   We will first address the defendant's argument that his sentence shocks the moral sense of the community.To support his argument, the defendant cites changes in the law that would preclude him from receiving a discretionary natural life sentence if he committed the murders as a juvenile today. See 730 ILCS 5/5-4.5-105(c) (West 2024); *People v. Buffer*, 2019 IL 122327, ¶¶ 35, 40-42; Pub. Act 100-1182 (eff. June 1, 2019) (codified as 730 ILCS 5/5-4.5-110(b) (West 2024)); Pub. Act 102-1128 (amending 730 ILCS 5/5-4.5-115(b)) (eff. Jan. 1, 2024). We agree with the State that the defendant has waived this portion of his argument.

¶ 118   "The rule of invited error or acquiescence is a procedural default sometimes described as estoppel." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). The rationale behind this rule is that it would be manifestly unfair to allow the defendant a new hearing on the basis of a decision which he interjected into the proceeding. *Swope*, 213 Ill. 2d at 217.

¶ 119   As is clearly set forth above, the defendant elected to be sentenced under the 1996 statute, and, as a result, received a discretionary natural life sentence. The defendant was made aware that

44

prior to the resentencing hearing, he may be sentenced to discretionary natural life under the 1996 statute. At no point did the defendant indicate that he would instead elect to be sentenced under the law in effect at the time of the resentencing. Rather, the defendant affirmed that he elected to be sentenced under the 1996 statute. He cannot now complain about the length of his sentence as a result of that election.

¶ 120   However, even if the defendant's argument was not waived, we find it unpersuasive. As determined above, the defendant elected to be sentenced under the 1996 statute; thus, the manner in which he may have been sentenced under the 2023 law is of no consequence. Moreover, the defendant's sentence does not shock the community's moral sense because various cases have upheld similar sentences. In *Gibbs*, the resentencing court, after considering the *Miller* factors, similarly sentenced the defendant to discretionary natural life under the 1992 version of the statute at issue here for two murders the defendant committed at the age of 17. *Gibbs*, 2022 IL App (5th) 200096-U, ¶¶ 27, 48-58. See, *People v. Brock*, 2022 IL App (3d) 200430, ¶ 97 (affirming a *de facto* life sentence for a defendant who murdered 2 victims when he was 16); *People v. Watkins*, 2023 IL App (5th) 200322, ¶ (affirming the *de facto* life sentence of a defendant who received 45 years for offenses he committed when he was 17). See also *People v. Williams*, 2024 IL App (5th) 220750-U, ¶¶ 4, 67 (affirming the defendant's natural life sentence for the 3 first degree murders he committed when he was 17).

¶ 121   Similarly, the defendant's sentence does not violate the proportionate penalties clause because the court properly considered his rehabilitative potential. Although the Illinois Constitution mandates that trial courts utilize both factors to determine the appropriate sentence— the seriousness of the offense and the rehabilitative objective—the Illinois Supreme Court has stated that " ' "there is no indication [in our constitution] that the possibility of rehabilitating an

offender was to be given greater weight and consideration than the seriousness of the offense." ' " *People v. Coty*, 2020 IL 123972, ¶ 24 (quoting *People v. Huddleston*, 212 Ill. 2d 107, 129 (2004), quoting *People v. Taylor*, 102 Ill. 2d 201, 206 (1984)). Factors that should be considered in "determining the seriousness of an offense include the degree of harm, the frequency of the crime, and the risk of bodily injury associated with it." (Internal quotation marks omitted.) *Id.* A defendant's rehabilitative potential is only one of the factors that a sentencing court should consider. *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010). Of greater importance is the seriousness of the offense. *Coty*, 2020 IL 123972, ¶ 24.

¶ 122   After reviewing the record of the defendant's resentencing hearing, we find that the resentencing court appropriately considered the seriousness of the murders committed by the defendant and decided that the natural life sentence was appropriate given the seriousness of the offense. See *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 34 (stating that the seriousness of the offense may outweigh the goal of rehabilitating the defendant). The resentencing court noted and considered the various rehabilitative efforts included in his mitigation evidence. Thus, the record supports the trial court's consideration of the defendant's rehabilitative potential. Despite the rehabilitative efforts pursued and completed by the defendant, the facts of these brutal murders weighed more heavily in supporting the natural life sentence imposed by the resentencing court. Therefore, we do not find that the defendant's natural life sentence was "cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." *Huddleston*, 212 Ill. 2d at 130.

¶ 123                                    III. CONCLUSION

¶ 124   For the above-stated reasons, we affirm the judgment of the resentencing court.

¶ 125   Affirmed.